699 So.2d 772 (1997)
Philip Goode VON EIFF and Cheryl Goode Von Eiff, Appellants,
v.
Leonor AZICRI and Roberto Azicri, Appellees.
No. 96-3273.
District Court of Appeal of Florida, Third District.
September 17, 1997.
Geiger, Kasdin, Heller, Kuperstein, Chames & Weil, and Robert Geiger and Johnathan A. Heller, Miami, for appellants.
*773 Brenda B. Shapiro, Miami, and Robin B. LeBlanc, Aventura, for appellees.
Before SCHWARTZ, C.J., and GERSTEN and GREEN, JJ.
GERSTEN, Judge.
Appellants, Philip and Cheryl Von Eiff, contend that the trial court abused its discretion by granting visitation to appellees, Leonor and Roberto Azicri ("grandparents"), the maternal grandparents of Philip's biological daughter. The appellants additionally claim that the visitation order is too broad, not in the best interests of the child, and that the underlying grandparent visitation statute is unconstitutional. We find the relevant statutory provision is constitutional and in the best interests of the child, but reverse and remand the order to reconsider the extent and frequency of visitation.

I
Kelly Von Eiff was born to Phillip and Luisa Von Eiff on March 14, 1991. Kelly's natural mother, Luisa, died of cancer in December of 1993. Two months later, Cheryl Goode moved in with Philip and Kelly. Cheryl eventually married Philip, hereafter collectively referred to as "parents", and adopted Kelly in October of 1994. Currently, Cheryl and Philip are in the process of a divorce and Kelly is living with her adoptive mother Cheryl.
Prior to Luisa's death, the grandparents frequently saw Kelly and got along well with Philip. However, this relationship deteriorated after Cheryl moved in with Philip. The grandparents' visits with Kelly were reduced, and ceased altogether after the adoption. In response, the grandparents filed a petition to compel visitation under section 752.01(1)(a), Florida Statutes (1995).
Section 752.01(1)(a) provides for reasonable grandparent visitation rights where one or both parents of a child are deceased, and where such visitation is found to be in the child's best interests. Philip and Cheryl opposed the petition arguing that visitation was not in Kelly's best interests, and that the statute unconstitutionally infringed on their parental rights.
After an unsuccessful mediation, the parties went to trial. Trial testimony revealed, and the trial court found, that limited grandparent visitation would be in Kelly's best interests. The trial court's order allowed the grandparents to have parentally supervised Friday night dinners with Kelly for eight weeks. Additionally, after the eight week introduction, Kelly would spend the night on alternating weekends with the grandparents, with parental supervision at the option of the grandparents. Lastly, the order also provided that Kelly would spend religious holidays with her grandparents.

II
We first address the constitutionality of section 752.01(1)(a). Simply, the state has a compelling interest in protecting children after a parent has died by preserving grandparent visitation that is in the child's best interests. Because section 752.01(1)(a) is narrowly tailored toward promoting this compelling interest, we find the provision constitutional.
Florida's grandparent visitation statute, section 752.01(1), Florida Statutes (1995), provides:
(1) The court shall, upon petition filed by a grandparent of a minor child, award reasonable rights of visitation to the grandparent with respect to the child when it is in the best interest of the minor child if:
(a) One or both the parents of the child are deceased;
(b) The marriage of the parents of the child has been dissolved;
(c) A parent of the child has deserted the child;
(d) The minor child was born out of wedlock and not later determined to be a child born within wedlock as provided in § 742.091; or
(e) The minor child is living with both natural parents who are still married to each other whether or not there is a broken relationship between either or both parents of the minor child and the grandparents, and either or both parents have used their parental authority to prohibit a *774 relationship between the minor child and the grandparents.
We stress that this case solely involves section (1)(a) of the statute where one or both of the parents are deceased. Under these circumstances, a court may award reasonable visitation rights to a grandparent only if visitation is in the best interests of the child. Factors utilized by the court in making such a determination include: the willingness of the grandparents to foster a close relationship between the child and the parents, the length and quality of any prior relationship between the grandparents and the child, the preferences of the child, and the mental and physical health of the grandparents and the child.[1]
In examining the constitutionality of section 752.01(1)(a), we recognize the potential conflict between grandparent visitation rights and a parent's constitutional privacy rights in directing the upbringing and education of their children without undue government interference. See Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925). However, this rule of parental privilege is not absolute, and yields where the state shows compelling reasons to promote the best interests of the child. See Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); Padgett v. Dep't of Health and Rehabilitative Services, 577 So.2d 565 (Fla.1991); Winfield v. Division of Pari-Mutuel Wagering, 477 So.2d 544 (Fla. 1985). For example, case law has established the state's compelling interest in protecting children from actual harm and the threat of harm. See Jones v. State, 640 So.2d 1084 (Fla.1994). The state also has a compelling interest in protecting children from emotional harm. See Nelson v. Nelson, 433 So.2d 1015 (Fla. 3d DCA 1983). Accordingly, the state can require that parents enroll their children in school, that they adequately feed them, clothe them, inoculate them, use child restraints in vehicles, and house them during curfews. See Bellotti v. Baird, 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979).
While we recognize the vital importance of the parental right to make childrearing decisions, well-established precedent clearly provides that the rights and concerns of the child must ultimately control.[2]See State ex rel. Sparks v. Reeves, 97 So.2d 18 (Fla.1957). The critical question then becomes: can it be in a child's best interests to permit grandparent visitation when one or both of the parents is deceased?
The Florida Supreme Court addressed grandparent visitation in Beagle v. Beagle, 678 So.2d 1271 (Fla.1996). The Court held that another section, section 752.01(1)(e) of the statute, unconstitutionally infringed on the privacy rights of the parents because it failed to require a showing of harm to the child who was living in an intact family.
*775 Yet the Florida Supreme Court carefully limited its unconstitutionality finding to the "intact family" section of the statute. The Court emphasized that the "inadequacy of the best interests test in this limited circumstance does not change or modify existing principles regarding the use of that test in other family law concepts." Beagle, 678 So.2d at 1272. The Court repeatedly emphasized that its decision requiring a showing of harm in the context of an intact family did not change any other application of the best interests test.[3]Beagle, 678 So.2d at 1277. Hence, it is manifest that the Court did not intend for the demonstrable harm requirement to extend to situations, such as the provision at issue here, which do not involve an intact family.[4]
This makes sense because the purpose behind requiring demonstrable harm no longer applies in the absence of an intact family situation. Courts are rightfully reluctant to interfere with the sheltered structure of an intact family because of the parent's fundamental right to raise their children. Thus logically the only cases holding provisions of visitation statutes unconstitutional deal solely with intact families.[5]See Beagle, 678 So.2d at 1271; Brooks, 454 S.E.2d at 769; Hawk, 855 S.W.2d at 573; Williams, 485 S.E.2d at 651.
However, under circumstances where families have been disrupted by death or divorce, the intact family is already compromised and the focus of the analysis shifts to the best interests of the child. See McAlister v. Shaver, 633 So.2d 494 (Fla. 5th DCA 1994)(discontinuity of parents' relationship allows the court to determine visitation or custody based solely on the child's best interests). In these situations, the state is historically empowered to protect the interests of those injured by the disruption.[6]See McRae v. McRae, 52 So.2d 908 (Fla.1951)(courts in dissolution proceedings have the inherent power to protect children and to do all things necessary for the administration of justice). To require an explicit finding of demonstrable harm under such circumstances would be superfluous.
The constitutionality of section 752.01(1)(a) must therefore be determined based upon a "best interests" analysis. While this is a determination that must be made on a case by case basis, we recognize the important interest in a child's relationship with his or her grandparents. Exposure to grandparents generally provides tremendous benefits *776 to the health and welfare of children.[7]See Ramey v. Thomas, 483 So.2d 747, 748 (Fla. 5th DCA 1986)(child's welfare is promoted in most cases by having grandparents, rather than by not having them).
Children benefit by exposure to an essential link with the past that provides them with a sense of family identity. See Christine David-Galbraith, Grandma, Grandpa, Where Are You?, 3 Elder L.J. 143 (1995). Children also benefit because their grandparents can provide an objective eye on events at home (i.e., calling attention to abuse) and offer a place of sanctuary. Additionally, research reveals that children in these relationships gain a respect for the elderly, are more secure, and are less likely to commit suicide or use drugs. Id. at 143.
At no time are the fruits of this relationship more beneficial then when a child's world is turned upside down by the death of a parent. Death centers a child in an emotional maelstrom threatening emotional development.[8] In these situations, a child needs the stability that grandparents can provide.[9]
Moreover, children can become innocent pawns in power struggles by their loved ones when a family is disrupted. See Cochran v. Cochran, 263 So.2d 292 (Fla. 2d DCA 1972). Allowing a parent without restraint to interfere with beneficial visitation in circumstances of death may exacerbate emotional trauma precisely when the child is most vulnerable. See Preston v. Mercieri, 133 N.H. 36, 573 A.2d 128 (1990)(abrupt termination of a meaningful relationship between the child and his grandparents would be cruel and inhumane after a parent has died).
This case provides the perfect example of a child placed in emotional jeopardy. Here, Kelly's natural mother died, and her father is divorcing her adoptive mother. Kelly, who now lives with her adoptive mother, is completely cut off from the beneficial, loving relationship she knew with her grandparents. A relationship her natural mother encouraged. Unlike united opposition in an intact family, this is not a case where the state is called upon to impose visitation over parental objections. Rather, this is a case where the state acts to insure the continuity of visitation already encouraged by a deceased parent.[10]
In Sketo v. Brown, 559 So.2d 381 (Fla. 1st DCA 1990), the First District faced a factually similar situation. There, the father died and the paternal grandparents sought visitation rights after the relationship with the mother deteriorated. The mother contested visitation on the grounds that this interfered *777 with her right to raise her children as she saw fit, and that the state lacked a compelling interest to require her to submit to visitation. The court held that section 752.01(1)(a) was facially constitutional because it met a sufficiently compelling state interest in protecting the welfare of children.[11]
We agree with Sketo. A court cannot blindly adhere to the right of privacy when this would be detrimental to a child's best interests. See In re Guardianship of D.A. McW., 429 So.2d 699 (Fla. 4th DCA 1983), approved, 460 So.2d 368 (Fla.1984)(grandparent visitation allowed where abrupt termination would be detrimental to a child's welfare). The state has a compelling interest, not in mandating how parents should raise their children, but to insure that a child's needs are not overlooked in these difficult circumstances. By preserving beneficial grandparent visitation rights after a parent has died, section 752.01(1)(a) promotes the state's compelling interest in the welfare of children.
Moreover, section 752.01(1)(a) is narrowly tailored and contains inherent safeguards which protect the fundamental rights of parents. First, parents have the opportunity and the right to object to visitation and apply it to their particular circumstances. Second, the statute pertains only to grandparents. Third, the statute allows for mediation of the dispute, prior to judicial review. Fourth, since there is no presumption that grandparents are entitled to visitation, the burden rests with the grandparents to show how visitation is in the child's best interests. Additionally, the statute itemizes specific factors for the court to assess the best interests of the child and whether visitation is appropriate. Finally, and perhaps most importantly, any visitation imposed by the statute is judicially modifiable. See Ward v. Dibble, 683 So.2d 666 (Fla. 5th DCA 1996); Sketo, 559 So.2d at 381. The trial court has the authority to reduce or even completely deny visitation. See Brago v. Brago, 604 So.2d at 866.
In conclusion, section 752.01(1)(a) which allows limited visitation to grandparents after a parent has died, promotes a compelling state interest in protecting the emotional well being of children, while simultaneously safeguarding the fundamental rights of parents. Accordingly, we find this section constitutional under Article I, section 23 of the Florida Constitution.[12]

III
Having determined that section 752.01(1)(a) is constitutional, we next address whether grandparent visitation is in the best interests of Kelly. In Kelly's short life her mother died, her father remarried, and is now in the process of getting a divorce from her adoptive mother. Kelly's father no longer lives in her home and she is now being cared for by her adoptive mother. From Kelly's perspective the world is constantly turning upside down.
Testimony at trial revealed that, because people close to Kelly have constantly disappeared from her life, she needs the stability that her grandparents would provide. Additional evidence also showed that Kelly has a loving relationship with her grandparents *778 and that severing this relationship would be detrimental to her. See Dixon v. Melton, 565 So.2d 1378 (Fla. 1st DCA 1990)(visitation allowed where grandchild suffered from the frustration of grandparent visitation by the mother). Our review of the record reveals competent, substantial evidence supporting the trial court's finding that visitation with her grandparents is in Kelly's best interests. See Dinkel v. Dinkel, 322 So.2d 22 (Fla.1975).
However, while we agree with that part of the trial court's order finding visitation proper, we find under these circumstances that the order was overly broad. Of particular concern are the provisions allowing the grandparents to mandate Kelly's religious development. The visitation order allows the grandparents extended visitation every other Friday evening for Sabbath dinner, in addition to numerous specific religious holidays. There is a wide gulf between simple visitation and religious tutelage. One of the most basic rights in determining the care and upbringing of a child is the teaching of moral standards and religious beliefs. See Bellotti v. Baird, 443 U.S. at 622, 99 S.Ct. at 3035, 61 L.Ed.2d at 797. The trial court abused its discretion by intruding too far into the parent's domain and should not have superseded the parents' objections as to how and what specific type of religious upbringing Kelly should have.
Additionally, we express severe reservations concerning whether the frequent dinners and visits are warranted when the lower court found the parents to be fit. Here, testimony revealed that frequent visits would be destructive to Kelly's normal pattern of living. Consequently, under these circumstances we find that the broad scope of the visitation order runs contrary to Kelly's best interests, and must be reversed. See Sketo, 559 So.2d at 381 (extensive visitation unreasonable and not in minor child's best interest); Fisher v. Fisher, 390 So.2d 142 (Fla. 3d DCA 1980)(visitation to grandparents upheld but order facilitating visitation by forbidding parent to remove children from Broward County reversed).

IV
In conclusion, finding that section 752.01(1)(a) does satisfy the requirements of the Florida Constitution, we affirm that part of the order permitting visitation by the grandparents because visitation is in Kelly's best interests. However, we reverse and remand to the trial court to reconsider the extent and scope of what constitutes reasonable visitation under these circumstances. See Ward v. Dibble, 683 So.2d at 666; Sketo, 559 So.2d at 381.
Because of the important and sensitive family law issues involved, we certify the following question to the Florida Supreme Court as one of great public importance:
MAY THE STATE CONSTITUTIONALLY ALLOW REASONABLE GRANDPARENT VISITATION WHERE ONE OR BOTH PARENTS OF A CHILD ARE DECEASED AND VISITATION IS DETERMINED TO BE IN THE BEST INTERESTS OF THE CHILD?
Affirmed in part; reversed in part and remanded; question certified.
SCHWARTZ, C.J., concurs.
GREEN, Judge (dissenting).
I respectfully dissent. I believe that the order under review should be reversed in toto and this case dismissed upon the grounds that the appellees/grandparents were entitled to no relief under section 752.01(1)(a), Florida Statutes (1993) where throughout the course of the proceedings below, the minor child continuously had two living married parents, her natural father, and adopted stepmother. Alternatively, I believe that the order must be reversed because this statute is facially unconstitutional under Article I, Section 23 of the Florida Constitution as well as the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

I
The majority has characterized this case as "[u]nlike united opposition in an intact family, this is not a case where the state is being called upon to impose visitation over parental objections." Majority op. at 776. Rather, *779 the majority states, "this is a case where the state acts to insure the continuity of visitation already encouraged by a deceased parent." Majority op. at 776. With all due respect, this overly simplistic assessment does not comport with the true factual scenario presented in this case. Indeed, the majority's myopic view of Kelly's legal familial situation during the course of this proceeding has unfortunately skewed its analysis of this case.
When the grandparents commenced this proceeding on December 15, 1994 for unsupervised visitation rights, Kelly was indeed living in an intact family with two parents; her natural father and adopted stepmother. Both of her parents were united in their opposition to Kelly's unsupervised visitation with the grandparents. At some point during the proceedings below, Kelly's parents separated[13] and remained separated up to the point when the lower court rendered its order. Despite their separation, Kelly's parents remained and remain united in their opposition to Kelly's unsupervised visitation with the grandparents. The lower court awarded, among other things, Kelly's unsupervised visitation with the grandparents over her parents' objections pursuant to section 752.01(1)(a)[14]. That section reads:
The Court shall, upon petition filed by a grandparent of a minor child, award reasonable rights of visitation to the grandparent with respect to the child when it is in the best interest of the minor child if:
(a) One or both parents of the child are deceased;
From the plain language of this statute, no grandparents can be conferred visitation rights under this subsection where a child has two living parents. Significantly, the legislature did not limit "parents" in this subsection to mean only natural parents as it did in section 752.01(1)(e)[15]
The majority states (indeed stresses) no less than three times that this case solely involved grandparental visitation in the context of one deceased parent. See Majority op. at 774, 774, and 776. Such an astonishing statement ignores and denies the existence of Kelly's adopted mother with whom Kelly now actually resides. Although not expressly stated, the clear implication of the majority's characterization of this case is that the rights and childrearing decisions of Kelly's adoptive mother either do not exist or, if they do exist, are subservient to the previous decisions made by Kelly's deceased natural mother. This, of course, is wholly at odds with the longstanding law and sound policy of this state that adopted parents be accorded the same legal rights and constitutional protections in parenting decisions as natural parents. See § 63.172(1)(c), Fla. Stat. (1996); Korbin v. Ginsberg, 232 So.2d 417, 418 (Fla. 4th DCA 1970) ("A judgment or decree of adoption establishes the relationship of parent and child to the same extent as though the child had been born to such parent in lawful wedlock."); Lee v. Kepler, 197 So.2d 570, 573 (Fla. 3d DCA 1967) ("The result of *780 the adoption by the stepmother `was to place the adopted child as far as possible in the same position as the natural child to all intents and purposes.'"); see also Simmons v. Simmons, 900 S.W.2d 682, 684 (Tenn.1995) ("The relationship between an adoptive parent and child is no less sacred than the relationship between a natural parent and child and that relationship is entitled to the same legal protection.").
The legal ramification of Kelly's adoption by her stepmother is that for all legal purposes and proceedings, Kelly is no longer the child of a deceased parent. See § 63.172(1)(b) (1996) (adoption "terminates all legal relationships between the adopted person and the adopted person's relatives,... so that the adopted person thereafter is a stranger to his or her former relatives for all purposes."). Instead, she is and remains the child of two living parents. Consequently, the grandparents could not be awarded visitation rights pursuant to section 752.01(1)(a)[16] and the lower court erred in so doing under the factual scenario presented in this case.

II
Although I believe that this case can and should be disposed of solely on the grounds that the grandparents were entitled to no relief under section 752.01(1)(a), where the minor child in this case has two living parents, I write further to illustrate why this statute in its entirety is nevertheless facially unconstitutional. In my view, because section 752.01, Florida Statutes (1995) requires no showing of demonstrable harm to a child prior to the imposition of forced grandparental visitation, it is facially unconstitutional under Article I, Section 23 of the Florida Constitution as well as the Due Process Clause of the Fourteenth Amendment to the United States Constitution.
At the outset, I point out that I fully concur with the sentiment expressed by our state supreme court in Beagle, that it is not appropriate for the judiciary to comment on the general wisdom or desirability of maintaining inter-generational relationships in a constitutional analysis. See Beagle, 678 So.2d at 1277; see also Brooks, 454 S.E.2d at 773-74 (the question of whether it might be "better" or "desirable" for a child to maintain contact with a grandparent is irrelevant to constitutional analysis). Consequently, I shall refrain from interjecting any opinion as to the need for maintaining the grandparent/grandchild relationship into this constitutional analysis.

A. RIGHT OF PRIVACY UNDER FLORIDA'S CONSTITUTION
On November 4, 1980, the citizens of this state voted to amend the Florida Constitution to include article I, section 23 which provides in relevant part that "[e]very natural person has the right to be let alone and free from governmental intrusion into his [or her] private life...." The far reaching impact of this amendment was poignantly observed by our supreme court:
The citizens of Florida opted for more protection from governmental intrusion when they approved [A]rticle I, [S]ection 23, of the Florida Constitution. This amendment is an independent, freestanding constitutional provision which declares the fundamental right to privacy. Article I, section 23, was intentionally phrased in strong terms. The drafters of the amendment rejected the use of the words "unreasonable" or "unwarranted" before the phrase "governmental intrusion" in order to make the privacy right as strong as possible. Since the people of this state exercised their prerogative and enacted an amendment to the Florida Constitution which expressly and succinctly provides for a strong right of privacy not found in the United States Constitution, it can only be concluded that the right is much broader in scope than that of the Federal Constitution.
In re T.W., 551 So.2d 1186, 1191-92 (Fla. 1989) (quoting Winfield, 477 So.2d at 548). The right of privacy guaranteed by article I, section 23 does not confer complete immunity *781 from governmental intrusion into the private lives of Floridians and will yield to compelling governmental interests. See Winfield, 477 So.2d at 547. However, before the right of privacy attaches and the compelling state interest is applied, there must be a threshold showing of a reasonable expectation of privacy. Id.
In the context of the parent/child relationship, it should be pointed out that even prior to the enactment of article I, section 23, Florida courts had always zealously guarded the rights of parents to raise their children without interference:
While according to the trial Judge a broad judicial discretion in the matter we nevertheless cannot lose sight of the basic proposition that a parent has a natural God-given legal right to enjoy the custody, fellowship and companionship of his offspring. This is a rule older than the common law itself and one which had its inception when Adam and Eve gave birth to Cain in the Garden of Eden. In cases such as this one the only limitation on this rule of parental privilege is that as between the parent and the child the ultimate welfare of the child itself must be controlling. (citations omitted).
In re Guardianship of D.A., McW., 429 So.2d 699, 702 (Fla. 4th DCA 1983) (quoting State ex rel. Sparks v. Reeves, 97 So.2d 18, 20 (Fla.1957)). Thus, the enactment of article I, section 23 merely codified these recognized rights of parents in constitutional form.[17]
Initially then, a determination must be made as to whether parents have a reasonable expectation of privacy in their decision to deny the grandparents access to their children. Although no case to date has expressly so stated, it appears to be an unassailable proposition that otherwise fit parents, such as the appellants who have neither abused, neglected, or abandoned their child, have a reasonable expectation that the state will not interfere with their decision to exclude or limit the grandparents' visitation with their child.[18] Indeed, even the majority apparently does not take exception with this basic proposition. Consequently, the critical issue in this analysis is whether absent any showing of harm to the child, the "best interest" standard is a compelling reason for the state to override any fit parent's decision to limit (or not) grandparental visitation, regardless of whether the family is intact or not. Contrary to the majority's conclusion, I do not believe that it is.
Florida is one of only five states which has an explicit right of privacy provision in its constitution. In the majority opinion, it is pointed out that most of the state courts which have considered the constitutionality of their respective grandparent statutes (i.e., Connecticut, Indiana, Kansas, Kentucky and Wyoming), have found such statutes to be constitutional. See Majority op. at 774 n. 1. What is not pointed out in the majority opinion, however, is the fact that none of the constitutions in those states have explicit privacy provisions. Thus, because Floridians have opted for more privacy protections than the citizens in those jurisdictions, the fact that their grandparent statutes have been found constitutional simply cannot carry any weight in Florida. Moreover, of the four other states which do have express privacy provisions in their constitutions (i.e., Alaska, California, Hawaii, and Montana)[19], not one of these jurisdictions to date has found the "best interest of the child" standard to be a compelling state interest.[20]
I believe that well-established precedent clearly supports the concept that any fit parent *782 has the absolute right to make child rearing decisions in the absence of a showing by the state that the parental decisions are harmful or detrimental to the welfare or well-being of the child. That is precisely why, as the majority points out, the state can constitutionally impose regulations requiring parents to provide the basic necessities of life to their children, to wit: school, food, clothing, inoculation, child restraint seats, and curfew hours. See Majority op. at 774. The state's only justifiable intrusion into these areas is to prevent harm to the child. See Schmitt v. State, 590 So.2d 404, 410 (Fla. 1991) (state has compelling interest in preventing the sexual exploitation of children), cert. denied, 503 U.S. 964, 112 S.Ct. 1572, 118 L.Ed.2d 216 (1992); Padgett v. Dep't of Health and Rehabilitative Servs., 577 So.2d 565, 571 (Fla.1991) (state may terminate parental rights where substantial risk of harm to child exists). These basic necessities of life are not merely provided in the child's "best interest" or general welfare. Indeed, without them, the child is at substantial risk of harm. A child's occasional visitation with a nonparent relative, however loving and doting, simply cannot be cast into the same category as these basic necessities of life, absent a showing of particularized physical or emotional harm.
As I understand the thrust of the majority's analysis, the state can: (1) enact any regulatory measure deemed to be in the child's best interest,[21] and (2) enforce the same over parental objections as long as the child's family is not intact. If the majority's reasoning were correct, then the state could not constitutionally enforce its curfew laws, child restraint seat laws, inoculation laws, school attendance laws, etc. against intact families who otherwise opposed the same. Contrary to the majority's position, the state's only compelling interest in these areas is that harm (whether physical or emotional) not befall the child. The state's compelling interest has nothing to do with the parent or child's family status.
Indeed, after the enactment of the privacy provision, one of the more telling decisions to recognize a parent's fundamental decision-making right, outside of the intact family context, was In re T.W. There, the supreme court held that a statute requiring an unmarried pregnant minor to obtain parental consent or judicial permission before terminating her pregnancy from conception to birth unconstitutionally infringed upon the minor parent's right to privacy under Article I, Section 23 of the Florida Constitution. Significantly, the court found that such a substantial intrusion into the minor parent's right of privacy was not necessary for the preservation of her maternal health or the potentiality of life in the fetus.
We ... adopt the end of the first trimester as the time at which the state's interest in maternal health becomes compelling under Florida law because it is clear that prior to this point no interest in maternal health could be served by significantly restricting the manner in which abortions are performed by qualified doctors, whereas after this point the matter becomes a genuine concern.
In re T.W., 551 So.2d at 1193. The significance of this decision to the issue before us is the state supreme court's recognition of the fact that the state's only compelling interest in these minor maternal parents was in their health; not their "well-being" or "best interests" in general.
If In re T.W. was not enough, any lingering doubts about the state's compelling interest in this area were most assuredly dispelled in the supreme court's decision in Beagle. There, in response to the specific certified *783 question of whether section 752.01(1)(e)[22] of the grandparent visitation statute was facially unconstitutional under Article I, Section 23 of the Florida Constitution or the Due Process Clause of the Fourteenth Amendment, the court held that it was, absent a showing of harm to the child. Citing to its holdings in In re T.W., Padgett, and Schmitt, the court said that these cases "have made it abundantly clear that the state can satisfy the compelling state interest standard when it acts to prevent demonstrable harm to a child." Beagle, 678 So.2d at 1276. Accordingly, the court concluded that because the challenged paragraph did not require the state to demonstrate a harm to the child prior to an award of grandparental visitation rights, the provision infringed upon the parent's fundamental right to raise their children. Id. Contrary to the suggestion made by the majority, the constitutional analysis of the state's compelling interest in Beagle did not turn on the fact that the Beagles were an intact family.[23] There is nothing in the Beagle analysis to suggest that parents who are single, widowed, separated, or divorced should have less constitutionally protected privacy rights in the rearing of their children than married parents in the context of an intact family.[24]
Despite the supreme court's pronouncement in Beagle and its prior decisions regarding the state's compelling reasons in this arena, the majority has apparently decided to embrace and adopt the first district's holding in Sketo which found section 752.01(1) to be facially constitutional. The Sketo court determined that "the state has a sufficiently compelling interest in the welfare of children that it can provide for the continuation of relations between children and their grandparents under reasonable terms and conditions so long as that is in the children's interest." 559 So.2d at 382. With all due respect to my colleagues in the majority, I believe that their adaptation of Sketo is wholly ill-advised.[25] Aside from the fact that the Sketo holding is wholly irreconcilable with the state supreme court decisions heretofore discussed and the federal court decisions subsequently to be discussed[26], I believe the Sketo (and hence the majority's) analysis is fundamentally flawed because it presupposes that a visitation dispute between a parent and a nonparent is the same as a visitation dispute between two parents. It is not. The clearest indication that these two types of disputes are not on the same level playing field can be found in the supreme court's decision in In re Guardianship of D.A. McW, 460 So.2d 368 (Fla.1984). There, the court found that then Judge Anstead of the fourth district had correctly articulated the test to be applied in a custody dispute between two parents and distinguished it from the test applicable to a custody dispute between a parent and a third party. "When a custody *784 dispute is between two parents, where both are fit and have equal rights to the custody, the test involves only the determination of the best interests of the child." Id. at 369-70. On the other hand, "[w]hen the custody dispute is between a natural parent and a third party, ... custody should be denied to the natural parent only when such an award will, in fact, be detrimental to the welfare of the child." Id. at 370. Because the Sketo court did not employ this correct analysis to the visitation dispute between the parent and grandparent, I echo Judge Webster's sentiments in Beagle, 654 So.2d 1260 (Fla. 1st DCA 1995), that Sketo was wrongly decided.[27]See Beagle, 654 So.2d at 1263 ("I would recede from that opinion and hold that the statute at issue here violates both, [A]rticle I, [S]ection 23 of the Florida Constitution and the Fourteenth Amendment to the United States Constitution.").[28] Indeed, because the "best interests" test is the appropriate standard only when a court is confronted with a custody or visitation dispute between two parents, the Beagle court carefully emphasized that its holding was "not intended to change the law in other areas of family law where the best interest of the child is utilized to make a judicial determination." Beagle, 678 So.2d at 1277.
In summation, I am not at all unsympathetic to the laudable legislative motives for the enactment of section 752.01(1) in its present form. I simply do not believe that any of its provisions can pass constitutional muster under Article I, Section 23 of Florida's Constitution where it does not require that demonstrable harm to the child be shown prior to the imposition of forced grandparent visits. If subsection (1)(e)[29] of the statute could not pass constitutional muster under article I, section 23 without a showing of harm to the child a fortiori, the remaining four provision of section 752.01(1) must necessarily fall as well because they similarly require no showing of harm to the child prior to the imposition of forced grandparent visitation.[30]
Unfortunately, I cannot join in the majority's question as certified because I do not believe it factually or adequately states the true issue that has been presented to us. In my view, the supreme court's ultimate decision in this case will necessarily be dispositive of all of the remaining provisions of section 752.01 since all of these provisions pertain to non-intact familial situations. Therefore, in the interest of judicial economy, it makes sense to me that the following question be certified to the supreme court:

*785 ARE SECTIONS 752.01(1)(A)-(D), FLORIDA STATUTES (1995), FACIALLY UNCONSTITUTIONAL BECAUSE THEY CONSTITUTE IMPERMISSIBLE STATE INTERFERENCE WITH PARENTAL RIGHTS PROTECTED BY EITHER ARTICLE I, SECTION 23, OF THE FLORIDA CONSTITUTION OR THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION?

B. RIGHT OF PRIVACY UNDER THE DUE PROCESS CLAUSE
Although I believe that the constitutionality of section 752.01 can and should be determined under state law, I write still further to point out why this statute is unconstitutional under the federal constitution as well.
The notion that there is a right of privacy or certain spheres of personal liberty into which the government may not intrude without strong justification, although not expressly stated in the federal constitution, finds its genesis in the Due Process Clause of the Fourteenth Amendment.[31]See Roe v. Wade, 410 U.S. 113, 152, 93 S.Ct. 705, 726, 35 L.Ed.2d 147 (1973) (quoting Palko v. Connecticut, 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937)). In a line of cases beginning with Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923) and Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), one of the fundamental rights or liberty interests recognized as being protected under the Due Process Clause is the right of a parent to rear their children without unwarranted government interference.
Thus, in Meyer, the Court struck down as unconstitutional a state statute which prohibited the teaching of any language other than English to children before the ninth grade. The Court declared generally that the liberty interest guaranteed by the Fourteenth Amendment "denotes not merely freedom from bodily restraint but also the right of the individual to ... establish a home and bring up children...." 262 U.S. at 399, 43 S.Ct. at 626. Further, although the Meyer Court acknowledged the general power of the state to compel school attendance and to prescribe a curriculum for its educational institutions, the Court significantly held that the statute could not pass constitutional muster absent a demonstrable showing of harm to the child:
No emergency has arisen which renders knowledge by a child of some language other than English so clearly harmful as to justify its inhibition with the consequent infringement of rights long freely enjoyed.
Id. at 403, 43 S.Ct. at 628.
Citing to Meyer, the Court subsequently said in Pierce that a state statute requiring all children to attend public schools "unreasonably interferes with the liberty of parents and guardians to direct the upbringing and education of children under their control," absent a showing by the state that a private education was inherently harmful. See Pierce, 268 U.S. at 534-35, 45 S.Ct. at 573.
The fundamental theory of liberty upon which all governments in this Union repose excludes any general power of the state to standardize its children by forcing them to accept instruction from public teachers only. The child is not the mere creature of the state; those who nurture him [or her] and direct his [or her] destiny have the right, coupled with the high duty, to recognize and prepare him [or her] for additional obligations.
Id. at 535, 45 S.Ct. at 573.
In Prince v. Massachusetts, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944), the Court recognized that the state as parens patriae could only intrude into parental decisions when the safety of children so required. There, the aunt and legal guardian of a minor appealed her conviction for violating the state's child labor laws, which prohibited, among other things, minors from selling newspapers, magazines or periodicals on any street or public place. The child's aunt, a Jehovah's Witness had permitted her minor niece to accompany her to a public street one evening to sell religious magazines. The aunt argued that the tenets of her family's faith dictated that they distribute religious *786 literature; thus, the state laws were violative of her rights under the First Amendment applied by the Fourteenth Amendment to the states. Her argument was buttressed, however, upon her claim of parental right as secured by the Due Process Clause of the Fourteenth Amendment. 321 U.S. at 164, 64 S.Ct. at 441. In rejecting her argument, the Supreme Court acknowledged that although the "custody, care, and nurture of the child reside first in the parents," the harm from which the child labor laws were seeking to protect, namely: "the crippling effects of child employment," particularly in public places and potential harms arising from other activities in such places, was not beyond regulation as against a claim of religious liberty. 321 U.S. 158, 166, 168, 64 S.Ct. 438, 442, 443.
Later, however, in Yoder, the Court held that the First and Fourteenth Amendments precluded the state from compelling Amish parents to send their children to high school, in derogation of the parents' religious beliefs. The Court rejected the state's all-encompassing parens patriae interest in the universal compulsory high school education for all children where there was no showing of harm to Amish children in their unique lifestyle. Distinguishing this case from Prince, the Court noted that:
[A]ccommodating the religious objections of the Amish by forgoing one, or at most two, additional years of compulsory education will not impair the physical or mental health of the child, or result in an inability to be self-supporting or to discharge the duties and responsibilities of citizenship, or in any other way materially detract from the welfare of society.
Yoder, 406 U.S. at 234, 92 S.Ct. at 1542.
The clear recurring theme in these cases is that under the Fourteenth Amendment, there must be a threshold showing of real or potential harm to a child before the state's intrusion into family life can be justified.[32] That is, absent a showing of harm or danger to the child, the state simply cannot, under the guise of promoting what it deems to be in the general welfare or best interest of a child, override parental decisions. Recently, a Virginia appeals court squarely held that the right of parents in raising their child is a fundamental right protected by the Fourteenth Amendment and that there must initially be a showing of actual harm before grandparental visitation can be ordered over the parents' objection. See Williams v. Williams, 24 Va.App. 778, 485 S.E.2d 651 (1997). The state's compelling interest cannot be satisfied simply upon a "best interest" showing.[33] As one legal commentator has said:
[T]o allow grandparents to receive visitation with their grandchildren because the court determines that the child's development will be "better because of it" is to set precedent which places in the courts the authority to direct the development of children; it gives to the state what is best reserved for the parents.[34]
Still another has aptly pointed out that:
Even assuming that the parent makes a mistake in denying the child the right to see the grandparent, the fundamental right of parents to make decisions concerning their children must include the right to make wrong decisions. For the state to delegate to the parents the authority to raise the child as the parents see fit, except when the state thinks another choice would be better, is to give the parents no authority at all.[35]
Thus, in the absence of any requirement of a showing of demonstrable harm to a child as a result of the deprivation of grandparental visitation, I believe that section 752.01(1) infringes upon fundamental rights guaranteed *787 to parents or guardians under the Fourteenth Amendment. The state's desire for grandparental visitation simply because it deems such visitation generally to be in the "best interest of all children" simply does not pass constitutional muster as a compelling state interest under the Due Process Clause of the federal constitution.

III
For all of the foregoing reasons, I believe that section 752.01(1) in its presently written form is facially unconstitutional under both the state and federal constitutions. I believe that this case presents an excellent opportunity for our supreme court to extend its Beagle holding to the remaining subsections of 752.01(1) to so state.
NOTES
[1] All fifty states have codified similar statutes designed to preserve the rights of grandparents to visit with their grandchildren. The majority of those state courts which have addressed this issue find these statutes constitutional. See Lehrer v. Davis, 214 Conn. 232, 571 A.2d 691 (1990); Sanchez v. Parker, 1995 WL 489146 (Del.Fam.Ct. 1995); Bailey v. Menzie, 542 N.E.2d 1015 (Ind. Ct.App.1989); Spradling v. Harris, 13 Kan. App.2d 595, 778 P.2d 365 (1989); King v. King, 828 S.W.2d 630(Ky.), cert. denied, 506 U.S. 941, 113 S.Ct. 378, 121 L.Ed.2d 289 (1992); Herndon v. Tuhey, 857 S.W.2d 203 (Mo.1993); Ridenour v. Ridenour, 120 N.M. 352, 901 P.2d 770 (App.), cert. denied, 120 N.M. 68, 898 P.2d 120 (1995); Campbell v. Campbell, 896 P.2d 635 (Utah.Ct. App.1995); Michael v. Hertzler, 900 P.2d 1144 (Wyo.1995).

By contrast, only a few states find grandparent visitation unconstitutional and have done so solely under circumstances involving an intact family. See Brooks v. Parkerson, 265 Ga. 189, 454 S.E.2d 769 (Ga.), cert. denied, ___ U.S. ___, 116 S.Ct. 377, 133 L.Ed.2d 301 (1995); Hawk v. Hawk, 855 S.W.2d 573 (Tenn.1993); Williams v. Williams, 24 Va.App. 778, 485 S.E.2d 651 (1997). Interestingly, the Tennessee Supreme Court in Hawk noted that because parents in a disrupted family might be less inclined to allow visitation with their former in-laws, the state had a stronger argument for visitation to protect the child when the nuclear family was destroyed. Hawk, 855 S.W.2d at 580.
[2] No state allows unfettered discretion to parents. "Except in countries which lie in barbarism, the authority of the parent over the child is nowhere left absolutely ... without definition and regulation." Bailey v. Menzie, 542 N.E.2d 1015, 1019 (Ind.Ct.App.1989), quoting State v. Clottu, 33 Ind. 409, 411 (Ind.1870).
[3] The Court specifically stated: "We emphasize again that our holding in this case is not intended to change the law in other areas of family law where the best interest of the child is utilized to make a judicial determination. In issuing this decision, we have no intent to disrupt or modify the current requirements for best interest balancing in those other areas of family law proceedings." Beagle, 678 So.2d at 1277.
[4] The thrust of the dissent's argument is that because Beagle found section (1)(e) unconstitutional as requiring a showing of harm in the context of an intact family, the remaining four provisions of the statute, even though dealing with completely different circumstances, must fall as well. Dissent at 784-85. A careful reading of Beagle shows quite the opposite. The Court went out of its way, on four separate occasions, to emphasize that its holding was limited to intact families. Beagle, 678 So.2d at 1271. In light of this specific language, we disagree with the dissent's contention that the demonstrable harm requirement should be extended to the remaining provisions of the statute as well.
[5] While the dissent correctly observes that states holding visitation statutes constitutional do not have Florida's explicit right of privacy, we more importantly point out that all states with privacy rights have enforced grandparent visitation premised solely on the best interests of the child. See Brown v. Brown, 914 P.2d 206 (Alaska 1996); In re Robert D., 151 Cal.App.3d 391, 198 Cal. Rptr. 801 (1984); Doe v. Doe, 85 Hawai'i 108, 937 P.2d 949 (App.1997); In re Marriage of Kovash, 260 Mont. 44, 858 P.2d 351 (1993).
[6] Section 752.01(1) was designed to protect the interests of children in disrupted families by preserving beneficial visitation. As noted by this court in Griss v. Griss, 526 So.2d 697 (Fla. 3d DCA 1988)(Pearson, J. concurring), review dismissed, 531 So.2d 1353 (Fla.1988), section 752.01(1) was intended to apply in situations where a family is disrupted by death or divorce, and the custodial parent spitefully prevents the children from visiting with their grandparents. The clear legislative intent behind this statute was to protect the interests of children to visit with their grandparents. See Griss, 526 So.2d at 700 (citing to Fla. H.R., Tape Recording of Proceedings (April 23, 1984)(tape available from Florida House of Representatives)(floor debate on H.B. 487)).
[7] As noted by one court: the "tensions and conflicts that mar relations between parents and children are often absent between those very same parents and their grandchildren ... visits with a grandparent are a precious part of a child's experience and there are benefits which devolve upon the grandchild from the relationship with his grandparents which he cannot derive from any other relationship." Mimkon v. Ford, 66 N.J. 426, 332 A.2d 199, 204 (1975).
[8] It is widely recognized that a fundamental disruption in a child's environment can significantly impair their development. "Near consensus does exist ... for the principle that a child's healthy growth depends in large part upon the continuity of his personal relationships. When divorce, death of a parent, foster care, or adoption intrude on a child's family life, such continuity is inevitably interrupted ... it seems reasonable... that a break in family continuity is detrimental to a child." Katharine T. Bartlett, Rethinking Parenthood as an Exclusive Status: The Need For Legal Alternatives When the Premise of the Nuclear Family Has Failed, 70 Va. L.Rev. 879, 902 (1984).
[9] Grandparents can alleviate much of the emotional trauma and impact associated with the disruption of a family. In fact, "studies ... show that the quality and strength of support a child receives following the death of a parent may protect the child from later psychiatric disorders. Maintaining existing ties to adults outside the nuclear family may help minimize a child's sense of grief and loss following a parent's death." Catherine M. Gillman, One Big, Happy Family? In Search of a More Reasoned Approach to Grandparent Visitation in Minnesota, 97 Minn. L.Rev. 1279, 1301-2 (1995).
[10] As an alternative argument, the dissent contends that section 752.01(1)(a) is inapplicable because Kelly is now adopted. Dissent at 780. We agree that an adoptive parent generally stands in the same shoes as a natural parent. See § 63.172(1)(c), Fla. Stat. (1995). That is not the point here. What triggers the application of section 752.01(1)(a) is the death of a parent. Thus, regardless of the fact Kelly was subsequently adopted, this section was triggered when her natural mother died.
[11] The dissent attempts to dismiss Sketo by contending that it is wholly irreconcilable with existing state and federal constitutional law. Dissent at 783-84. In doing so the dissent likens beneficial visitation to such complete deprivations of parental rights as the termination of custody, or the veto of a minor child's abortion. See In re Guardianship of D.A. McW., 460 So.2d 368 (Fla. 1984); In re T.W., 551 So.2d 1186 (Fla.1989). This goes too far. The denial of custody and the abortion veto are both fundamental usurpations of parental power that completely override the ability of parents to control their children. Visitation cannot be compared to such drastic usurpations of parental power. See In re Guardianship of D.A. McW., 429 So.2d 699 (Fla. 4th DCA 1983), approved, 460 So.2d 368 (Fla.1984). The parents retain complete control over their children. Moreover, whereas visitation is modifiable, abortion or the complete termination of parental rights is not. Unlike the circumstances in cases cited by the dissent, section 752.01(1)(a) does not involve the complete dismissal of parental control, but the preservation of control through the maintenance of visitation rights already granted by the deceased parent.
[12] The dissent cites a number of cases to support the contention that section 752.01(1) violates the federal constitution. Our resolution of this issue under Florida's more restrictive right of privacy makes any analysis under the federal constitution irrelevant. See Beagle, 678 So.2d at 1272.
[13] Ironically and sadly, in the proceedings below, Kelly's father attributed the demise of their otherwise intact family to the emotional and financial strain of this litigation with the grandparents.
[14] The grandparents have pointed out to us in their brief that the appellants were subsequently divorced after the commencement of this appeal. This subsequent event, however, cannot appropriately be factored into our decision since it was not litigated before the lower court. See Hillsborough County Bd. of County Comm'r v. Public Employees Relations Comm., 424 So.2d 132, 134 (Fla. 1st DCA 1982) (appellate court will not consider evidence that was not presented to lower tribunal, since function of court is to determine whether lower tribunal committed error based on issues and evidence before it); see also Rosenberg v. Rosenberg, 511 So.2d 593, 593 n. 3 (Fla. 3d DCA 1987) (appellate review is limited to record as made before that court at time of entry of final judgment or order complained of), review denied, 520 So.2d 586 (Fla.1988).
[15] Prior to being declared unconstitutional in Beagle v. Beagle, 678 So.2d 1271 (Fla.1996), that subsection permitted reasonable grandparental visitation if it was in the child's best interests where:

(e) The minor is living with both natural parents who are still married to each other whether or not there is a broken relationship between either or both parents of the minor child and the grandparents, and either or both parents have used their parental authority to prohibit a relationship between the minor child and the grandparents. (emphasis added).
[16] Nor could the lower court's order be sustained under section 752.01(1)(b) which permits visitation if the marriage of the parents of the child has been dissolved. It is undisputed that Kelly's parents remained married throughout the course of the proceedings below.
[17] See Michael J. Minerva, Jr., Grandparent Visitation: The Parental Privacy Right to Raise Their "Bundle of Joy", 18 Fla. St. U.L.Rev. 533, 545 (1991).
[18] Id.
[19] Arizona, Illinois, Louisiana, South Carolina, and Washington have included privacy protections in their search and seizure provisions. See Beagle, 678 So.2d at 1275, n. 9.
[20] The majority cites to decisions from these states, Brown v. Brown, 914 P.2d 206 (Alaska 1996); In re Robert D., 151 Cal.App.3d 391, 198 Cal.Rptr. 801 (1984); Doe v. Doe, 85 Hawai'i 108, 937 P.2d 949 (App.1997); In re Marriage of Kovash, 260 Mont. 44, 858 P.2d 351 (1993), which have enforced grandparent visitation premised solely upon the best interests of the child. None of these decisions, however, presented a constitutional challenge to the grandparent statute under the state's privacy provision.
[21] Interestingly enough, most people would agree that any number of things are generally in a child's best interestattending college, having regular preventative medical or dental checkups, instilling religious and/or spiritual values at a young age, restricting the number of television viewing hours, etc. Few, if any people, however, would dare suggest that the state has the power to constitutionally enact measures to require parents to provide such things or impose such restrictions on their children. That is because while these measures, like grandparental visitation, may be deemed to be in the child's best interests, it does not necessarily follow that a child will sustain harm in the absence of them. The notion that the state could regulate and usurp those and other areas from the parents based solely upon the "best interest" test would effectively make the state and not the parent primarily responsible for childrearing.
[22] That portion of the statute provides that:

(1) The court shall, upon petition filed by a grandparent of a minor child, award reasonable rights of visitation to the grandparent with respect to the child when it is in the best interest of the minor child if:
* * * * * *
(e) The minor is living with both natural parents who are still married to each other whether or not there is a broken relationship between either or both parents of the minor child and the grandparents, and either or both parents have used their parental authority to prohibit a relationship between the minor child and the grandparents.
[23] Indeed, if the majority was correct on this point, the supreme court would have had to recede from In re T.W. rather than cite to it with approval in Beagle.
[24] The majority makes much to do about the fact that the supreme court in Beagle carefully limited its unconstitutionality finding to the "intact family" section of the statute. The sole reason for the court's limited holding, however, was because the intact family provision of the statute, section 752.101(1)(e), was the only provision put at issue before the court. See Beagle at 1272. If the supreme court had deemed this subsection unconstitutional when applied to intact families, it would have decided Beagle on this basis and not engaged in the "demonstrable harm" analysis.
[25] See Judge Webster's concurring opinion in Beagle v. Beagle, 654 So.2d 1260 (Fla. 1st DCA 1995), where he indicated his preference to recede from Sketo and hold that "the statute at issue here violates both [A]rticle I, [S]ection 23 of the Florida Constitution and the Fourteenth Amendment to the United States Constitution." Id. at 1263.
[26] Sketo is also factually distinguishable where the minor child there did not have an adopted stepparent as in this case.
[27] Significantly, the fourth district in In re The Guardianship of D.A., McW., also recognized that despite the superiority of the natural parents' rights to visitation over those of the grandparents, visitation privileges could be afforded to the grandparents if an abrupt and complete severance of the child's relationship with the grandparent would be detrimental to the child. 429 So.2d at 704.
[28] Sketo has also been appropriately criticized by one legal commentator as "merely [paying] lip service to the compelling state interest test":

It disregards the superiority of parental rights and treats the dispute as one between persons of equal rights with respect to the children. According to the Sketo court, any regulation asserting the welfare of children as its touchstone need only be reasonable, rather than serving a compelling state interest. If this assertion were sufficient to carry the state's burden, the Florida Supreme Court would not have struck down the parental consent law in T.W., in which the state attempted to justify its law by asserting a compelling interest in the protection of immature minors.
See Minerva, supra note 1, at 551.
[29] That portion of the statute provides that:

(1) The court shall, upon petition filed by a grandparent of a minor child, award reasonable rights of visitation to the grandparent with respect to the child when it is in the best interest of the minor child if:
(e) The minor is living with both natural parents who are still married to each other whether or not there is a broken relationship between either or both parents of the minor child and the grandparents, and either or both parents have used their parental authority to prohibit a relationship between the minor child and the grandparents.
[30] The remaining provisions of this section permit the imposition of grandparental visits solely when it is in the best interest of the minor child if:

(a) One or both parents of the child are deceased;
(b) The marriage of the parents of the child has been dissolved;
(c) A parent of the child has deserted the child; [or]
(d) The minor child was born out of wedlock and not later determined to be a child born within wedlock as provided in s. 742.091....
[31] See also Minerva, supra note 1, at 540.
[32] See Cynthia L. Greene, Grandparents Visitation Rights: Is the Tide Turning?, 12 J. Am. Acad. Matrim. Law 51, 57 (1994).
[33] Interestingly, it is clear from the Sketo decision that these federal cases were cited to that court. Based upon its holding, I can only conclude that the Sketo court misapprehended the significance of these federal decisions.
[34] Kathleen S. Bean, Grandparent Visitation: Can the Parent Refuse?, 24 J. Fam. L. 393, 441, n. 30 (1985-86).
[35] Greene, supra note 11, at 59.