720 So.2d 510 (1998)
Philip Goode VON EIFF and Cheryl Goode Von Eiff, Petitioners,
v.
Leonor AZICRI and Roberto Azicri, Respondents.
No. 91647.
Supreme Court of Florida.
November 12, 1998.
Robert S. Geiger, Jonathan A. Heller, Avi J. Litwin and Elida Landry of Geiger, Kasdin, Heller, Kuperstein, Chames & Weil, P.A., Miami, for Petitioners.
Brenda B. Shapiro, Miami, and Allison Doliner Hockman, Coral Gables, for Respondents.
Andrew H. Kayton, Miami, for American Civil Liberties Union Foundation of Florida, Inc., Amicus Curiae.
PARIENTE, Justice.
We have for review a decision certifying the following question to be of great public importance:
MAY THE STATE CONSTITUTIONALLY ALLOW REASONABLE GRANDPARENT VISITATION WHERE ONE OR BOTH PARENTS OF A CHILD ARE DECEASED AND VISITATION IS DETERMINED TO BE IN THE BEST INTERESTS OF THE CHILD?
Von Eiff v. Azicri, 699 So.2d 772, 778 (Fla. 3d DCA 1997). We have jurisdiction. See art. V, § 3(b)(4), Fla. Const. We rephrase the certified question as follows:
IS SECTION 752.01(1)(a), FLORIDA STATUTES (1993), FACIALLY UNCONSTITUTIONAL BECAUSE IT IMPERMISSIBLY INFRINGES ON PRIVACY RIGHTS PROTECTED BY ARTICLE I, *511 SECTION 23 OF THE FLORIDA CONSTITUTION?
As rephrased, we answer the certified question in the affirmative and quash the decision below. As we did in the similar case of Beagle v. Beagle, 678 So.2d 1271, 1272 (Fla. 1996), we emphasize that
our determination today is not a comment on the desirability of interaction between grandparents and their grandchildren. We focus exclusively on whether it is proper for the government, in the absence of a demonstrated harm to the child, to force such interaction against the express wishes of at least one parent....

BACKGROUND
At common law, grandparents had no legal right to visit their grandchildren if the child's parents opposed the visitation. See Parker v. Gates, 89 Fla. 76, 103 So. 126 (1925); Olds v. Olds, 356 N.W.2d 571, 572-73 (Iowa 1984); see also Theresa H. Sykora, Grandparent Visitation Statutes: Are the Best Interests of the Grandparent Being Met Before Those of the Child?, 30 Fam. L.Q. 753, 758 (1996). Thus, any order that granted visitation rights to a nonparent, including a grandparent, was deemed "unjustified" and "unenforceable." See Sheehy v. Sheehy, 325 So.2d 12, 12 (Fla. 2d DCA 1975); Lee v. Kepler, 197 So.2d 570, 573 (Fla. 3rd DCA 1967).
In Florida, the first grandparent visitation legislation was enacted in 1978, in the context of dissolution of marriage actions. See Beagle, 678 So.2d at 1272-73.[1] In Beagle, we outlined the historical development of the statutes concerning grandparent visitation in Florida, which culminated in the enactment of chapter 752. Id.
Chapter 752, entitled "Grandparental Visitation Rights," provides grandparents[2] with a freestanding cause of action, unconnected with a dissolution of marriage, for visitation rights with their minor grandchildren:
(1) The court shall, upon petition filed by a grandparent of a minor child, award reasonable rights of visitation to the grandparent with respect to the child when it is in the best interest of the minor child if:
(a) One or both parents of the child are deceased;
(b) The marriage of the parents of the child has been dissolved;
(c) A parent of the child has deserted the child;
(d) The minor child was born out of wedlock and not later determined to be a child born within wedlock as provided in s. 742.091; or
(e) The minor is living with both natural parents who are still married to each other whether or not there is a broken relationship between either or both parents of the minor child and the grandparents, and either or both parents have used their parental authority to prohibit a relationship between the minor child and the grandparents.
§ 752.01(1)(a)-(e), Fla. Stat. (1993) (emphasis supplied).
In Beagle, this Court concluded that subsection 752.01(1)(e) was facially unconstitutional because "the challenged paragraph infringes upon the rights of parents to raise their children free from government intervention." 672 So.2d at 1272. We find that the reasoning in Beagle compels the same conclusion as to subsection 752.01(1)(a), which mandates that the court "shall" award visitation to the grandparents when it is in the best interest of the child, if "one or both parents of the child are deceased."

FACTS
Philip and Luisa Von Eiff were married in 1990. In 1991, their daughter Kelly (child) was born. Luisa, the biological mother, died of cancer in December 1993. In July 1994, Philip remarried. His new wife, Cheryl Von Eiff, legally adopted the child several months later, in October 1994.
*512 In December 1994, the Azicris, the child's biological maternal grandparents (grandparents), filed a petition for unsupervised visitation with the child, as authorized by subsection (1)(a), alleging that the biological father and adoptive mother (Von Eiffs) had refused reasonable visitation with the child, and that such visitation was in the child's best interests. The Von Eiffs countered that they had a fundamental privacy right to determine with whom the child associated and that subsection (1)(a) violated that right.
At a non-jury trial, the grandparents testified that they had played an active role in the first two years of the child's life, but that soon after the biological mother died they were denied unsupervised visitation with their grandchild. The Von Eiffs never refused the grandparents contact with the child, but insisted that one of them, or an acceptable third person, be present during any visit.
The grandparents offered various reasons why the arrangement was unacceptable. For example, they explained that it was painful to visit the home of their deceased daughter where Philip Von Eiff now lived with his new wife. They were also offended that the Von Eiffs would even question their right to be alone with their granddaughter. The Von Eiffs countered that, as the child's parents, they had a right to withhold or condition visitation. Philip testified to various attempts that had been made to allow the grandparents to visit the child. He and his wife ultimately decided that visitation should be supervised because of their concerns about the grandparents' demonstrated hostility towards the parents and lack of respect for their parental judgment. The trial court ruled in favor of the grandparents and ordered unsupervised visitation with the child. In so ruling, the trial court found that the Von Eiffs "are loving, nurturing, and fit parents for the minor child," but that their "substantive reasons ... for terminating all visitation or at the maximum permitting only supervised restricted visitation do not rise to the level of severity that can be regarded with credibility by this Court." The trial court determined that it was in the best interests of the child to have a relationship with her maternal grandparents restored.
The Von Eiffs appealed to the Third District, which upheld the constitutionality of subsection (1)(a). See Von Eiff, 699 So.2d at 778. The majority found that "the state has a compelling interest in protecting children after a parent has died by preserving grandparent visitation that is in the child's best interests," and that subsection (1)(a) is "narrowly tailored" to promote this compelling interest. Id. at 773. The majority distinguished Beagle, in part, by emphasizing that the Von Eiff family was no longer "intact," having been disrupted by the death of the biological mother. See id. at 775.
The majority determined that competent substantial evidence supported the trial court's finding that visitation with the grandparents was in the child's best interests. See id. at 778. However, the court reversed in part, finding that the trial court had abused its discretion by including provisions in its order "allowing the grandparents to mandate [the child's] religious development." Id. The majority also expressed "serious reservations" concerning the overall frequency of visitation. Id.
Judge Green authored a lengthy dissent. She concluded that subsection (1)(a) is facially unconstitutional under article 1, section 23 of the Florida Constitution because it does not require a showing of demonstrable harm to a child prior to the imposition of grandparental visitation. See 699 So.2d at 780-87 (Green, J., dissenting).
Since Von Eiff was decided, the Fourth and Fifth Districts have found subsection (1)(a) to be an unconstitutional infringement on a parent's right of privacy. See Russo v. Persico, 706 So.2d 933, 934 (Fla. 4th DCA 1998), review granted, 722 So.2d 193 (Fla. 1998); Fitts v. Poe, 699 So.2d 348, 348 (Fla. 5th DCA 1997). The First District has aligned itself with the Von Eiff majority, certifying conflict with Fitts. See S.S. v. J.M.N., 703 So.2d 1212, 1212 (Fla. 1st DCA 1997); see also Sketo v. Brown, 559 So.2d 381 (Fla. 1st DCA 1990).

*513 ANALYSIS

The United States Supreme Court has recognized, as one aspect of the liberty interest protected by the Due Process Clause of the Fourteenth Amendment, "a right of personal privacy," which includes "the interest in independence in making certain kinds of important decisions." Carey v. Population Servs., Int'l, 431 U.S. 678, 684, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977). While noting that "the outer limits of this aspect of privacy have not been marked," the Supreme Court found it "clear that among the decisions that an individual may make without unjustified government interference are personal decisions relating to marriage, procreation, contraception, family relationships, and child rearing and education." Id. at 684-85, 97 S.Ct. 2010 (citations omitted).
In Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), the United States Supreme Court specifically acknowledged the fundamental liberty interest of parents in the "care, custody and management" of their children. This Court has likewise on numerous occasions recognized that decisions relating to child rearing and education are clearly established as fundamental rights within the Fourteenth Amendment of the United States Constitution. See Beagle, 678 So.2d at 1275; Padgett v. Department of Health & Rehabilitative Servs., 577 So.2d 565, 570 (Fla.1991); Florida Bd. of Bar Exam'rs re: Applicant, 443 So.2d 71, 76 (Fla. 1983); Shevin v. Byron, Harless, Schaffer, Reid & Assocs., Inc., 379 So.2d 633, 637 (Fla.1980); see also B.B. v. State, 659 So.2d 256, 258-59 (Fla.1995). The individual's interest in making decisions in these areas of privacy, characterized as "the right of decisional autonomy," is implicit in the "concept of ordered liberty," and may not be intruded upon absent a compelling state interest. Shevin, 379 So.2d at 636.
In a decision by the Tennessee Supreme Court holding Tennessee's grandparent visitation statute unconstitutional, Justice Daughtrey traced the federal constitutional underpinnings of a parent's right to rear his or her children free from unwarranted government intervention:
[T]he right to rear one's children is so firmly rooted in our culture that the United States Supreme Court has held it to be a fundamental liberty interest protected by the Fourteenth Amendment to the United States Constitution....
The Supreme Court has reaffirmed this right on many occasions. In Pierce v. Society of Sisters, 268 U.S. 510, 534-5, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), the Court voided a law that prohibited parents from choosing private education over public schooling for their children, reasoning that the law would "unreasonably interfere[ ] with the liberty of parents ... to direct the upbringing and education of [their] children." Similarly, in Wisconsin v. Yoder, 406 U.S. 205, 207, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), the Court upheld the right of Amish parents to withdraw their children from public schools after the eighth grade in order to educate them according to Amish beliefs. The Court found that "[t]he history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children." Id. at 232, 92 S.Ct. 1526. The Court acknowledged that these rights are "subject to limitation ... if it appears that parental decisions will jeopardize the health or safety of the child, or have a potential for significant social burdens." Id. at 233-34, 92 S.Ct. 1526. However, finding no such threat, the Court permitted the parent's choice, basing its holding on First Amendment protections and "the fundamental interest of parents, as contrasted with that of the State." Id. at 232, 92 S.Ct. 1526. The right to rear one's child is, therefore, heavily protected by federal constitutional jurisprudence.
Although often expressed as a "liberty" interest, the protection of "childrearing autonomy" reflects the Court's larger concern with privacy rights for the family. The Court in Prince v. Massachusetts, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944), acknowledged the existence of a "private realm of family life which the state cannot enter." ... The Court's protection of parental rights ... evidences a deeper concern *514 for the privacy rights inherent in the federal Constitution.
Hawk v. Hawk, 855 S.W.2d 573, 578 (Tenn. 1993) (footnotes and parallel citations omitted).
While an implicit right of privacy is recognized under our federal constitution, Floridians enjoy an explicit right of privacy under article 1, section 23 of the Florida Constitution, which provides in pertinent part that "[e]very natural person has the right to be let alone and free from governmental intrusion into his private life." In enacting this freestanding constitutional provision, the "citizens of Florida opted for more protection from governmental intrusion" than that afforded under our federal constitution. Beagle, 678 So.2d at 1275 (quoting Winfield v. Division of Pari-Mutuel Wagering, 477 So.2d 544, 548 (Fla.1985)). The state constitutional right to privacy is much broader in scope, embraces more privacy interests, and extends more protection to those interests than its federal counterpart. See City of North Miami v. Kurtz, 653 So.2d 1025, 1027-28 (Fla.1995); In re T.W., 551 So.2d 1186, 1191-92 (Fla.1989); State v. Conforti, 688 So.2d 350, 357 (Fla. 4th DCA), review denied, 697 So.2d 509 (Fla.1997).
When analyzing a statute that infringes on the fundamental right of privacy, the applicable standard of review requires that the statute survive the highest level of scrutiny:
The right of privacy is a fundamental right which we believe demands the compelling state interest standard. This test shifts the burden of proof to the state to justify an intrusion on privacy. The burden can be met by demonstrating that the challenged regulation serves a compelling state interest and accomplishes its goal through the use of the least intrusive means.
Winfield, 477 So.2d at 547; see also B.B., 659 So.2d at 259. In holding that "this is a highly stringent standard" of review, this Court in In re T.W. noted that it could cite no cases in Florida in which "government intrusion in personal decisionmaking" survived the compelling state interest test. 551 So.2d at 1192.
In Beagle, we unequivocally announced that "the imposition, by the State, of grandparental visitation rights implicates the privacy rights of the Florida Constitution." 678 So.2d at 1275. Based on our State's constitutional privacy right, this Court then held that "the State may not intrude upon the parents' fundamental right to raise their children except in cases where the child is threatened with harm." Id. at 1276 (emphasis supplied). We determined that subsection (1)(e) did not survive the stringent standard of the compelling state interest test because it did not require a showing of demonstrable harm to the child before the State's intrusion upon the parent's fundamental rights. See id.
Subsection (1)(a) suffers from the same infirmity and therefore also fails to survive the compelling state interest test. Subsection (1)(a) mandates that the trial court "shall" order grandparent visitation upon the grandparent's petition, "when in the best interest of the minor child," without first requiring proof of demonstrable harm to the child.[3]
Neither the legislature nor the courts may properly intervene in parental decisionmaking absent significant harm to the child threatened by or resulting from those decisions. See id. at 1275. In Hawk, the Tennessee Supreme Court analogized this threshold requirement of harm to the bifurcated procedure utilized in foster care placement and approved by the United States Supreme Court in Santosky. See Hawk, 855 S.W.2d at 581. The Hawk court found that the State must first establish parental unfitness or significant harm to the child before a "best interests of the child" analysis can be utilized. 855 S.W.2d at 581; see also Santosky, 455 U.S. at 759-61, 102 S.Ct. 1388.
*515 As explained in Hawk, "[b]y applying this type of analysis, ... [the court] avoid[s] the `unquestioning judicial assumption' that grandparent-grandchild relationships always benefit children, an assumption that overlooks the necessity of a threshold finding of harm before the state can intervene in the parent-child relationship." 855 S.W.2d at 581 (footnote omitted). This threshold requirement thus ensures that the focus will not be on the perceived benefits of a grandparent-grandchild relationship before the need for government intervention is assessed.
The grandparents concede that there is a right of privacy connected with parenting decisions, but argue that the death of the parent triggers the basis for government intervention. They assert that Florida has a compelling interest in preserving the familial bond between grandparents and grandchildren, especially where one or both parents are deceased.
Finding that the death of one of the child's biological parents gives rise to a compelling state interest would inappropriately expand the types of harm to children that have traditionally warranted government intervention in parental decision-making. For example, in Padgett we found a compelling interest in the State protecting its "citizensespecially its youthagainst the clear threat of abuse, neglect and death." 577 So.2d at 570. We have also found a compelling state interest in preventing sexual exploitation of children within the home. See Schmitt v. State, 590 So.2d 404, 415-16 (Fla.1991). Likewise, the State has an obligation to ensure that children receive reasonable medical treatment that is necessary for the preservation of life. See, e.g., M.N. v. Southern Baptist Hosp., 648 So.2d 769, 770 (Fla. 1st DCA 1994).
As this Court explained in Beagle, "[o]ur cases have made it abundantly clear that the State can satisfy the compelling state interest standard when it acts to prevent demonstrable harm to a child." 678 So.2d at 1276 (emphasis supplied). The potential harm to a child flowing from the death of a parent does not constitute the kind of harm this Court has previously found to authorize government intervention. We agree with Judge Green's dissenting opinion in Von Eiff that "it appears to be an unassailable proposition that otherwise fit parents ... who have neither abused, neglected, or abandoned their child, have a reasonable expectation that the state will not interfere with their decision to exclude or limit the grandparents' visitation with their child." 699 So.2d at 781 (Green, J., dissenting).
The grandparents further urge us to distinguish our holding in Beagle as involving "an intact family," whereas, here, the original family is no longer "intact" due to the death of the child's biological mother. Although in Beagle we refer to the fact that the Beagles were an "intact" family, we based our decision in Beagle on the constitutionally protected privacy rights parents have in the rearing of their children. The result we reach in this case flows logically from our decision in Beagle.
Under Beagle, the State could not force grandparent visitation against the "express wishes" of Philip Von Eiff before the death of the biological mother, "in the absence of demonstrated harm to the child." 678 So.2d at 1272. We find nothing in the unfortunate circumstance of one biological parent's death that would affect the surviving parent's right of privacy in a parenting decision concerning the child's contact with her maternal grandparents. Philip Von Eiff, whom the trial court found to be a "loving, nurturing and fit" parent, continues to enjoy a right of privacy in his parenting decisions, despite the death of the child's biological mother. As succinctly stated by the Fifth District, under operatively identical facts in finding subsection (1)(a) unconstitutional: "[W]e are unable to discern any difference between the fundamental rights of privacy of a natural parent in an intact family and the fundamental rights of privacy of a widowed parent." Fitts, 699 So.2d at 348-49.
In addition, Philip Von Eiff has remarried and his new wife, Cheryl Von Eiff, adopted the child, thereby together forming a new "intact" family. While our result does not depend upon this factual scenario, the fact that a new intact family was formed illustrates the difficulty in allowing government intervention into family decision-making *516 based on whether the family is "intact." Moreover, the adoption of the child by Cheryl Von Eiff creates the same "relationship... for all purposes" between the adopted child and the adoptive parent "that would have existed if the adopted [child] were [the adoptive parent's] blood descendant." § 63.172(1)(c), Fla. Stat. (1993).
Besides the constitutional infirmity, there is an inherent problem with utilizing a best interest analysis as the basis for government interference in the private lives of a family, rather than requiring a showing of demonstrable harm to the child. It permits the State to substitute its own views regarding how a child should be raised for those of the parent. It involves the judiciary in second-guessing parental decisions. It allows a court to impose "its own notion of the children's best interests over the shared opinion of these parents, stripping them of their right to control in parenting decisions." Beagle, 678 So.2d at 1276 (quoting Hawk, 855 S.W.2d at 582).
We recognize that the death of a biological parent may be a traumatic event for a child and that a family may deal with that tragic event in many different ways. Some parents may decide that counseling is beneficial for the child; others may disagree. Some parents may decide that the child should spend more time with the deceased biological parent's grandparents, siblings or close friends. Others may restrict those relationships. Interaction with the grandparents may help ease the pain of loss for both grandparent and child and, thus, be beneficial to the child. However, as we stated in Beagle, "[i]t is irrelevant, to this constitutional analysis, that it might in many instances be `better' or `desirable' for a child to maintain contact with a grandparent." 678 So.2d at 1277 (quoting Brooks v. Parkerson, 265 Ga. 189, 454 S.E.2d 769, 773-74 (Ga.1995)).
As quoted in Hawk:
If the courts attempt to resolve these disputes when the only thing at stake is a grandparent's argument that visitation is a `better' decision for the child, the placement of the child with the parent becomes subject to the court's supervision and judgment of what are the best decisions for the child.
855 S.W.2d at 581 (quoting Kathleen Bean, Grandparent Visitation: Can the Parent Refuse?, 24 Fam. L.J.U. Louisville 393, 444-45 (1985-86)). However laudable the purpose of this statute, as Justice Overton explained in Beagle:
[I]t is not our judicial role to comment on the general wisdom of maintaining intergenerational relationships. We must refrain from expressing our personal thoughts as either grandparents or future grandparents.
678 So.2d at 1277.
We recognize that it must hurt deeply for the grandparents to have lost a daughter and then be denied time alone with their granddaughter. We are not insensitive to their plight. However, familial privacy is grounded on the right of parents to rear their children without unwarranted governmental interference.
The Von Eiffs possess a constitutional right of privacy in their decision to limit the grandparents' visitation with their child. The Von Eiffs are loving, nurturing and fit parents, whose parenting decisions do not constitute a substantial threat of demonstrable harm to the child's health or welfare. Thus, the decision they have made regarding the grandparents' visitation with the child is protected by our State's constitution.

CONCLUSION
There may be many beneficial relationships for a child, but it is not for the government to decide with whom the child builds these relationships. This concept implicates the very core of our constitutional freedoms and embodies the essence of Florida's constitutional right of privacy.
In summary, government interference in a parent's decision to exclude or limit grandparental visitation cannot be countenanced without a showing of a compelling state interest. No compelling state interest underlies *517 subsection 752.01(1)(a), however well-meaning its purpose.[4] Accordingly, we declare subsection 752.01(1)(a) facially unconstitutional, quash Von Eiff, disapprove the First District's opinions in S.S. and Sketo, and approve the Fourth District's opinion in Russo and the Fifth District's opinion in Fitts. We remand for further proceedings consistent with this opinion.
It is so ordered.
HARDING, C.J., and OVERTON, SHAW, KOGAN, WELLS and ANSTEAD, JJ., concur.
NOTES
[1] Originally found in subsection 61.13(2)(b), Florida Statutes (Supp.1978), a modified version of this statute now appears in subsection 61.13(2)(b)2.c., Florida Statutes (1997).
[2] Section 752.001, Florida Statutes (1993), broadly defines grandparent to include a great-grandparent.
[3] As we made clear in Beagle v. Beagle, 678 So.2d 1271, 1277 (Fla.1996):

[O]ur holding in this case is not intended to change the law in other areas of family law where the best interest of the child is utilized to make a judicial determination. In issuing this decision, we have no intent to disrupt or modify the current requirements for best interest balancing in those other areas of family law proceedings.
[4] While we refrain from substituting our determination of what would be in the "best interests" of a child upon the death of one of that child's parents, we cannot help but note that this statute sanctions litigation, and the expense of litigation, for families grappling with grandparental visitation disputes, and places children squarely in the center of that litigation. If a compelling state interest were to exist, alternatives such as providing mediation services, counseling, or other non-mandatory (and non-adversarial) services might facilitate grandparent visitation and build stronger intergenerational family relationships.