STONE, C.J.
We reverse an order denying the natural mother’s petitions for termination of the natural father’s parental rights and granting the paternal grandparents’ request for visitation.
The father was initially given custody of the three minor children by stipulation in a 1990 Connecticut divorce. In 1993, the father shot his girlfriend twice with a shotgun and killed her in their Connecticut home while the children were in the house. The father was arrested the evening of the shooting, and was eventually found guilty of murder. He was sentenced to 60 years imprisonment by a Connecticut court and will not be eligible for release for at least twenty to thirty years, perhaps consider *1052 ably longer. In the murder trial, the father’s defense was based on a claim that he was delusional. In that trial, psychiatrists testified that he suffers from paranoid schizophrenia.
The paternal grandparents had temporary custody of the children for several months after the murder until the mother was given sole custody by a stipulated modification, which provided for grandparent visitation. The children visited the father in jail several times before the mother moved to Florida. The petitions for termination, filed by the mother and children, allege outrageous conduct by the father constituting abuse and abandonment. The paternal grandparents filed a separate petition for visitation, based on the Connecticut modification of judgment, that was considered with the mother’s petitions.
In this action, the father testified that Sue, the victim of the homicide, lived in their home, acting as caretaker of the home and children. The children called her by her first name, and also occasionally called her “Mommy.” The father acknowledged that they loved her.
The trial court received testimony from two psychiatrists, several social workers and a nurse who treated and examined the children. Each testified to the children’s extensive functioning problems and disorders which they linked, based upon treatment and observation, to the events on the night of the murder. All of these witnesses diagnosed the children as suffering, among other conditions, from post-traumatic stress syndrome. One was diagnosed with fear and anxiety disorders and a speech disorder. That child’s symptoms included flashbacks, nightmares, regressed behavior, aggressiveness and destructiveness, socialization troubles, and significant developmental delay.
A social worker testified that she provided therapy for one of the other children, who had behavioral problems including tantrums, aggression, bed-wetting, nightmares, and mood swings. Another social worker testified that she provided.therapy for the eldest child, who was eight years old at the. time. He had nightmares, was significantly angry, had complaints of headaches and stomach problems, and was very anxious. During play therapy, the child would play out or talk about his fear that the father would get out of prison and hurt him or his brothers.
One of the psychiatrists testified that each child has symptoms of post-traumatic stress disorder from the murder, which include flashbacks, nightmares, outbursts, angry outbursts, irritable behavior, and mood swings. The children have expressed fear of the father, and no other feelings about him. He related that the children also are afraid of the paternal grandparents. He opined that allowing the father contact with the children would add more trauma to that already experienced by the children.
Another social worker had seen the three children in Connecticut before custody was transferred to the mother. That witness also found the children to be suffering from post-traumatic stress disorder. Although the children did not tell her that they were afraid of the grandparents, they did say that the grandmother often yelled and screamed. The children did, however, say positive things about the grandfather.
Another psychiatrist testified that he saw the eldest child in 1995. The child’s mood vacillated between sadness, rage, and fear. He also diagnosed the child with post-traumatic stress disorder, major depression with suicidal ideations, and a learning disability. That doctor also evaluated the youngest child as having a generalized anxiety disorder. The child was fearful and experienced bed-wetting and nightmares which the doctor related to fears involving the father and the grandparents.
A large part of the social worker and psychiatrist testimony dealt with whether, and how, the children had related their experience on the night of the murder and *1053 their feelings about their father and the victim. As to some of this, the children’s statements, years after the fact, were conflicting.
The guardian ad litem for the children recommended that the father’s rights be terminated because it was in the children’s best interests. The guardian did recommend in favor of grandparent visitation. The children’s mother, who suffers from multiple sclerosis, testified that her husband, their stepfather, loves and wants to adopt the children.
The mother and stepfather terminated the grandparent visitation upon a counsel- or’s advice. The mother testified to incidents in which the children indicated that they feared and did not want to visit the grandparents. She testified that after visiting the grandparents, the children exhibited many problems and anxieties. She also testified to the grandparents’ interference with her parenting. On the other hand, the grandparents denied the mother’s allegations, denied that the incidents testified to by the mother and doctors had occurred, and there was testimony that they had a good relationship with the children.
In its order, the trial court concluded that the mother had not proven that the children saw or heard the murder as she claimed. The trial court determined that it was probably the mother’s pressure that caused the children to dwell on the incident and to believe that they witnessed things that they did not witness; and that it is more likely that she was the cause of the children’s mental health problems. The court also found that the lives of the children were never physically endangered on the night of the murder by the father’s acts. The court granted the paternal grandparents’ motion for visitation based on the Connecticut decree.
We have reviewed the record and conclude that the trial court erred in denying the petition to terminate parental rights, in failing to find egregious abuse and abandonment by the father in the facts surrounding the murder, and in failing to determine the issues under section 39.464, Florida Statutes, adversely to the father.
Notwithstanding that the children may not have seen the shooting, the murder of their mother figure in their home and while they were present in the house certainly qualifies as egregious conduct that endangered the life, health, or safety of the children. The trial court’s finding that the mother’s conduct and not the father’s acts was the cause of the children’s multiple symptoms (that all of the experts deemed to be the result of post-traumatic stress syndrome) is not supported by the evidence.
Section 39.464(l)(e), Florida Statutes (1997),[1] provides that a person may petition for termination .of parental rights where:
(e) When the parent or parents engaged in egregious conduct that endangers the life, health, or safety of the child or the child’s sibling or had the opportunity and capability' to prevent egregious conduct that threatened the life, health, or safety of the child or the child’s sibling and knowingly failed to do so.
[[Image here]]
2. As used in this subsection, the term “egregious abuse” means conduct of the parent or parents that is deplorable, flagrant, or outrageous by a normal standard of conduct. Egregious abuse may include an act or omission that occurred only once but was of such intensity, magnitude, or severity as to endanger the life of the child.
We do not believe this statute must be interpreted as limiting termination under these circumstances to only those cases where the fives of the children are directly threatened, as if they had been in the line of fire. We can also discern no basis to *1054 decide that the single act of egregious abuse may not be deemed so simply because the children’s lives were not in immediate danger when the act occurred. Cf. Richmond v. Dep’t. of Health and Rehabilitative Servs., 658 So.2d 176 (Fla. 5th DCA 1995)(upholding dependency adjudication where delusional mother kept loaded gun in house); In re J.A.C., 634 So.2d 1087 (Fla. 2d DCA 1993)(upholding termination upon finding of prospective abuse where father confessed to mother’s murder and children believed he was guilty); Turner v. Adoption of Turner, 352 So.2d 957 (Fla. 1st DCA 1977)(upholding termination of father’s parental rights upon finding of abandonment based on imprisonment for murder of child’s mother which demonstrated his unfitness for a parental relationship and failure to communicate or otherwise establish a relationship with the child).
Section 39.464(l)(d)[2] now provides that a person may seek termination:
When the parent of a child is incarcerated in a state or federal correctional institution and:
1. The period of time for which the parent is expected to be incarcerated will constitute a substantial portion of the period of time before the child will attain the age of 18 years;
2. The incarcerated parent has ... been convicted of first degree or second degree murder in violation of s. 782.04 ... or has been convicted of an offense in another jurisdiction which is substantially similar to one of the offenses listed in this paragraph ...; and
3. The court determines by clear and convincing evidence that continuing the parental relationship with the incarcerated parent would be harmful to the child and, for this reason, that termination of the parental rights of the incarcerated parent is in the best interest of the child.
We recognize that because the father was incarcerated in 1993 this statute would not apply. See W.T.J. v. E.W.R., 721 So.2d 723 (Fla.1998). We further recognize that prior to the enactment of section 39.464(l)(d), the cases provided that incarceration alone is not enough to support a termination of parental rights; there must be something more. See In re B.W., 498 So.2d 946 (Fla.1986); Yem v. State, Dep’t. of Health and Rehabilitative Servs., 462 So.2d 1147 (Fla. 3d DCA 1984). However, incarceration is a fact which the trial court may consider along with other factors, such as the father’s willful commission of a crime, the foreseeable consequence of which is the father’s incarceration during a majority of the children’s lives, in determining whether clear and convincing evidence of abandonment exists. See W.T.J. v. E.W.R. Here, the mother has overwhelmingly, by clear and convincing evidence, met her burden to show that the father’s murder of the children’s “mother figure” in their home, which has predictably resulted in the father’s incarceration well past the children’s age of majority, demonstrates egregious abuse and abandonment such that continuation of the father’s parental relationship with the children would be harmful and against their best interest. See id. We note that in Turner v. Adoption of Turner, 352 So.2d 957 (Fla. 1st DCA 1977), parental rights were also terminated where a father murdered the mother and a friend and was serving a life sentence, recognizing that the circumstances demonstrate unfitness to maintain the parental relationship.
Because we reverse as to the termination issue, we must also reverse as to the trial court’s order granting grandparent visitation. Termination of the father’s parental rights made him a legal stranger *1055 to the proceedings. See Stefanos v. Rivera-Berrios, 673 So.2d 12 (Fla.1996). We find, therefore, that the legal effect of termination of the father’s parental rights, for purposes of section 752.01(l)(a), Florida Statutes, is essentially equivalent to his decease. In Von Eiff v. Azicri, 720 So.2d 510 (Fla.1998), our supreme court held section 752.01(l)(a), Florida Statutes, which permitted court ordered grandparent visitation where one parent is deceased, unconstitutional as violative of the surviving parent’s privacy rights guaranteed by article I, section 23 of the Florida Constitution. Accord Persico v. Russo, 721 So.2d 302 (Fla.1998); see also Beagle v. Beagle, 678 So.2d 1271 (Fla.1996)(statute permitting court ordered grandparent visitation in intact family held unconstitutional as impermissibly infringing on privacy rights).
The termination of the father’s parental rights substantially modifies the circumstances and mandates our enforcement of Petitioner’s right, as a sole surviving parent, to privacy protection under the Florida Constitution. In Von Eiff, the supreme court acknowledged that it was not unsympathetic to the plight of the grandparents under analogous circumstances, but that the grandparents’ interests, and even the best interest of the children, must yield to the fundamental right of privacy when demanded by the parent except where the state has a compelling interest, as when it acts to prevent demonstrable harm to the child.
We have considered the argument that the Connecticut visitation order -is entitled to full faith and credit. However, a visitation provision such as this, while entitled to our respect on comity principles, does not prevent the application of an overriding provision of our law, applying a paramount public policy. See generally, Morris v. Kridel, 179 So.2d 130 (Fla. 2d DCA 1965); Krasnosky v. Krasnosky, 282 So.2d 186 (Fla. 1st DCA 1973). But see Kalusin v. Schwadron, 695 So.2d 817 (Fla. 3d DCA 1997). As our supreme court has recognized, few policies in the state are more paramount than enforcement of an exercise of a recognized constitutional right to privacy. Cf. Von Eiff.
In this record, there is no evidence of abuse or neglect by the mother or stepfather to compel state intervention. Therefore, the order granting the grandparent’s petition is reversed. On remand, we instruct the trial court to grant the petition for termination of the father’s parental rights and vacate the order compelling grandparent visitation.
KLEIN and TAYLOR, JJ., concur.

. This section was amended effective October 1, 1998 and renumbered as § 39.806(1)(0-

. Now section 39.806(l)(d). This subsection took effect on October 1, 1997, and "applies to any person incarcerated after October 1, 1997, who is sentenced to a term of incarceration which would qualify under the provisions of this act....” Ch. 97-226 § 6, at p. 15, Laws of Fla.