787 So.2d 875 (2001)
In the Interest of Z.J.S., a child.
J.R.S., father, Appellant,
v.
Department of Children and Families, Appellee.
J.R. and V.R., husband and wife, Appellants,
v.
Department of Children and Families, Appellee.
Nos. 2D00-545, 2D00-1262.
District Court of Appeal of Florida, Second District.
February 14, 2001.
*876 Suzanne Harris, Lakeland, for Appellant J.R.S.
Ryan Thomas Truskoski of Ryan Thomas Truskoski, P.A., Orlando, for Appellants J.R. and V.R.
Douglas Sherman, Department of Children and Families, Bartow, for Appellee.
ALTENBERND, Acting Chief Judge.
J.R.S., the father, appeals a judgment terminating his parental rights to his four-year-old child, Z.J.S.[1] J.R., the paternal cousin of Z.J.S., and J.R.'s wife, V.R., appeal an order that denied their request to place Z.J.S. in their home after the trial court terminated the father's parental rights. We have consolidated these two cases for the purpose of this opinion. We reverse the judgment of termination because the trial court failed to identify a proper statutory basis for the termination. This reversal renders the cousins' appeal moot.
When Z.J.S. was born in January 1997, he suffered from significant health problems. At that time, J.R.S. was almost sixty years old and also in poor health. Z.J.S.'s mother had mental difficulties. Both parents received social security disability benefits as their primary source of income. The couple lived in a small travel trailer and occasionally traveled from place to place seeking temporary employment within their abilities. Due to this precarious situation, the Department of Children and Families intervened and placed Z.J.S. in shelter care shortly after his birth. The trial court thereafter adjudicated Z.J.S. dependent and the Department placed him in foster care.
After assessing the family's situation, the Department decided not to offer J.R.S. a case plan with a goal of reunification. Instead, in June 1997, it presented J.R.S. with a case plan with a goal of termination of parental rights.[2] It appears that the Department did not comply with section 39.601, Florida Statutes (1999), both in formulating the plan and in its content. Instead, the case plan was a standard form plan, not tailored to the specific needs of Z.J.S. and his parents.[3]
This case plan was odd. Although the plan called for a goal of termination, it set forth tasks for J.R.S. to complete that are *877 the type of tasks required to achieve reunification. To a lay person, the plan implied that if J.R.S. were to complete these tasks, then the Department would terminate his parental rights. Actually, these tasks are designed to give J.R.S. a chance to achieve reunification despite the Department's goal. In addition, it appears no services were offered to J.R.S. to assist him in accomplishing any of the tasks assigned to him. Instead, the case plan stated: "Protective services supervision was not appropriate due to the parents not having a stable residence" and indicated that no multi-disciplinary case staffing was needed.[4] In sum, the plan itself advanced the goal of termination by providing J.R.S. no assistance in complying with the plan and no incentive to do so. This case plan was approved by the court, but J.R.S. rejected the plan and refused to sign it.
For about a year after the trial court approved the case plan, while Z.J.S. remained in foster care, the Department was unable to locate J.R.S. Then, in August 1998, the Department undertook a diligent search and contacted J.R.S. by letter. The letter asked J.R.S. to indicate whether he was able to care for the child or whether there were family members who would do so; otherwise, the letter warned, his parental rights would be terminated. At this point, J.R.S. responded, and indicated that his paternal cousin, J.R., and J.R.'s wife, V.R., were willing and able to take custody of the child. J.R.S. set up visitation between himself, the child, and J.R. and V.R. The couple has visited the child on a regular basis ever since.
The Department filed a petition to terminate J.R.S.'s parental rights on March 10, 1999. The petition alleged that J.R.S. failed to substantially comply with the case plan, that he neglected the child by failing to cooperate with the services offered to him, that he abandoned the child, and that he did not have the ability to provide for the child such that the child's health and well-being would be endangered in his care. At the final hearing, however, the Department focused its case exclusively on J.R.S.'s failure to comply with the case plan.
While this case was pending, Z.J.S. was placed in a medical foster home with a foster parent who wanted to adopt him. At the time of the final hearing, Z.J.S., then age two and a half, had been in this home for almost two years. When J.R. and V.R. expressed an interest in adopting the child and began to visit with him, the Department directed them to undertake certain tasks to obtain the Department's approval for such a placement. J.R. and V.R. completed those tasks and sought placement of the child with them. At one point, the Department apparently supported this request. Then, for reasons not explained in this record, the Department withdrew its support. Thereafter, the Department asserted that the continued placement of the child in his foster home was in the child's best interests.
At the final hearing, J.R.S. objected to the termination. He asserted he was unable to comply with the case plan because of his age and his numerous health problems. He primarily argued, though, that the child should be placed with his relatives, J.R. and V.R.
After hearing the evidence, the trial court entered a final judgment terminating J.R.S.'s parental rights, finding that J.R.S. failed to comply with his case plan in seven material respects. Thereafter, the order *878 simply stated: "It is manifestly in the best interest of the child to terminate his parental rights pursuant to section 39.810, Fla. Statutes." After a subsequent hearing, the trial court entered a separate order continuing the placement of the child in his foster home, finding that the child's best interests were served by this placement rather than by changing custody from the foster parent to J.R. and V.R.[5]
We must reverse this case because the Department did not appreciate the requirements in section 39.806(1)(e), Florida Statutes (1999), when it sought termination from the trial court.[6] Section 39.806(1), Florida Statutes (1999), sets forth nine grounds upon which a parent's rights to his child can be terminated.[7] Section 39.806(1)(e) allows for termination of parental rights if, after a child has been adjudicated dependent, the child continues to be abused, neglected, or abandoned. This subsection provides that a parent's failure to comply with a case plan for a period of twelve months constitutes evidence of continuing abuse, neglect, or abandonment. However, the twelve-month period begins to run "only after the child's placement into shelter care or the entry of a disposition order placing the custody of the child with the department or a person other than the parent and the approval by the court of a case plan with a goal of reunification with the parent, whichever came first." (Emphasis added.)
We acknowledge that this statute is not a model of clarity. Nevertheless, this section applies only if a parent is provided a case plan with a goal of reunification, not with a goal of termination. The Department has conceded that it did not offer J.R.S. a case plan with a goal of reunification. As a result, it must establish one of the other bases for termination of J.R.S.'s parental rights. Because the Department concentrated solely on J.R.S.'s failure to comply with the case plan, the record below was not sufficiently developed to determine whether another ground for termination was appropriate. We therefore reverse the final judgment of termination and remand for further proceedings.
As to the appeal by J.R. and V.R., who wish to have custody of Z.J.S. and eventually adopt him, our reversal of the *879 judgment terminating J.R.S.'s parental rights makes their appeal moot at the present time.[8] On remand, the trial court may revisit whether the child should be placed in their care, either temporarily or permanently. As pointed out in Judge Northcutt's special concurrence, the proper placement of the child may be intertwined with the trial court's decision on whether parental rights should be terminated. Although the Department has some discretion in determining where a child should be placed, the relatives may retain some administrative remedies regarding the Department's decisions about the placement of this child. See, e.g., Fla. Admin. Code R. § 65C-16.002(2), .005, .008 (providing for an Adoptive Applicant Review Committee for dispute resolution and further administrative review). In addition, though we make no comment on the merits of the termination case, we remind the trial court of its authority to continue visitation between the child and the relatives if it is in the child's best interest, even if parental rights are terminated and a subsequent adoption by a third party is approved. See § 39.469(7), Fla. Stat. (1999).
Case No. 2D00-545 is reversed and remanded for proceedings consistent with this opinion. Case No. 2D00-1262 is dismissed as moot.
WHATLEY, J., concurs.
NORTHCUTT, J., concurs specially.
NORTHCUTT, Judge, Concurring.
I wholeheartedly agree with Judge Altenbernd's opinion, but I write separately to emphasize that J.R.S.'s determination to place his child with his relatives is, itself, a parenting decision that I believe is entitled to much deference under the federal and Florida constitutions. Our society recognizes that parents have fundamental rights to the care, custody and management of their children. See Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); State ex rel. Sparks v. Reeves, 97 So.2d 18, 20 (Fla.1957). See also Richardson v. Richardson, 766 So.2d 1036 (Fla. 2000). Many parents who are unable to tend their children elect to place them with relatives or friends to ensure that the children receive proper care. Surely, such decisions are within the ambit of fundamental parenting rights, and the state has no authority to interfere with them in the absence of the exceptional circumstances specified in Chapter 39, Florida Statutes.[9]
Viewed in this light, J.R.S.'s desire to send Z.J.S. to relatives has two significant ramifications. First, it is important to note that if J.R.S. had been able to tend his child, his resumption of parenting responsibilities beginning in 1998 might well have precluded a finding of abandonment notwithstanding his earlier lapses. See § 39.01(1), Fla. Stat. (1999); In the Interest of M.R.L., 608 So.2d 548 (Fla. 4th DCA 1992). See also M.S. v. D.C., 763 So.2d 1051 (Fla. 4th DCA 1999) (noting that incarceration which prevents parent from *880 caring for child, alone, is insufficient to support termination of parental rights); In the Interest of B.W., 498 So.2d 946 (Fla. 1986) (holding termination of parental rights improper when abandonment was involuntary). Cf. F.C. v. State, Dep't of Children and Families, 2001 WL 28553 (Fla. 2d DCA 2001) (noting that while father's infrequent visitation in 1997 and 1998 could imply a rejection of his parental obligations, his resumption of visitation in 1999 cast doubt on that implication); Carlson v. State, Dep't of Health and Rehabilitative Services, 378 So.2d 868 (Fla. 2d DCA 1979) (reversing for new hearing when evidence to support termination reflected conditions in mother's earlier marriage, not the present situation in her new marriage). In my estimation, J.R.S.'s decision to entrust his child to capable and loving relatives and to facilitate their bond by arranging visitation among them evinced no less concern for Z.J.S.'s welfare than if J.R.S. had been able to resume caring for the child himself. As such, J.R.S.'s efforts in this regard must weigh against terminating his parental rights.
Second, as mentioned, I believe the constitution mandates respect for a parent's private placement decision just as it does for the myriad other choices a parent must make in the raising of a child. In other words, the state may not veto a parent's determination to place his child with another caregiver simply because a different placement might be better. Even in the context of a dependency proceeding, a parent in J.R.S.'s position who seeks the return of his child is not required to prove that he can furnish better care than the Department or a foster parent can provide. Rather, the parent must demonstrate only that he has substantially complied with his case plan "to the extent that the safety, well-being, and physical, mental, and emotional health of the child is not endangered by the return of the child to the home." § 39.508(9)(a)8.b., Fla. Stat. (1999); see also §§ 39.508(14), Fla. Stat. (1999) (providing that upon expiration of the case plan, or sooner if the parents have substantially complied with it, the court shall issue an order to show cause why it should not return the child to the parents); 39.810 (in a termination proceeding, consideration of manifest best interest of the child "shall not include a comparison between the attributes of the parents and those of any persons providing a present or potential placement for the child.").
For these reasons, if on remand the court concludes that the circumstances do not justify terminating J.R.S.'s parental rights, his desire to have his child placed with his relatives should be assessed according to similar criteria, and it should be accorded great weight. This is especially so, considering that the child's dependency did not result from any abusive behavior or emotional incapacity on J.R.S.'s part. Indeed, at the termination hearing the Department emphasized that J.R.S. was unable to care for his child because of physical limitations, an assessment with which J.R.S. concurred. Therefore, he endeavored to provide for Z.J.S.'s welfare in the one way he could, by placing the child with relatives who have the wherewithal to meet all of Z.J.S.'s needs. This arrangement promised the child a safe environment and a connection to his family history. And, significantly, it was consistent with statutory provisions emphasizing that relatives merit special consideration in placement decisions. See §§ 39.001(1)(g), (i), (j); .401(2)(a)(3), (3); .402(1)(c); .5085.
Just as important, J.R.S.'s effort to place his child with members of his own family was consistent with the principle that even when state involvement in parent-child relationships is justified, its intervention must be the "least restrictive", see § 39.302(2)(a), Fla. Stat. (1999), and it *881 should be tempered by respect for the parent's constitutional rights and, where appropriate, by a willingness to encourage parental participation in placement decisions. In light of these principles, on remand the trial court should carefully consider whether J.R.S.'s physical limitations truly justify eradicating any relationship between him and his child, and denying him any input into the child's future.
NOTES
[1] The trial court terminated the natural mother's rights in a prior order that the mother did not appeal.
[2] Generally, the goal of a performance agreement is reunification. However, chapter 39 permits the Department to file an initial case plan with a goal of termination. See § 39.01(26), Fla. Stat. (1999) (defining "expedited termination" as one in which case plan with goal of reunification is not being offered); § 39.806(2), (3), Fla. Stat. (1999).
[3] For example, the case plan required J.R.S. to obtain "stable income/ employment," even though his age and health problems qualified him for social security disability. The plan also required a substance abuse evaluation, although there was no indication of substance abuse.
[4] Most noticeably, the Department made no effort to obtain dependent social security benefits for Z.J.S. despite indications that these benefits were available to him as a dependent of J.R.S.
[5] As the trial court noted, both the foster parent and the relatives offered loving and capable homes, making this a difficult decision.
[6] Section 39.806(1)(e), Florida Statutes (1999), provides:

A petition for termination of parental rights may also be filed when a child has been adjudicated dependent, a case plan has been filed with the court, and the child continues to be abused, neglected, or abandoned by the parents. In this case, the failure of the parents to substantially comply for a period of 12 months after an adjudication of the child as a dependent child or the child's placement into shelter care, whichever came first, constitutes evidence of continuing abuse, neglect, or abandonment unless the failure to substantially comply with the case plan was due either to the lack of financial resources of the parents or to the failure of the department to make reasonable efforts to reunify the parent and child. Such 12-month period may begin to run only after the child's placement into shelter care or the entry of a disposition order placing the custody of the child with the department or a person other than the parent and the approval by the court of a case plan with a goal of reunification with the parent, whichever came first.
[7] As we have previously stated, chapter 39 does not allow for the termination of parental rights simply for failing to comply with a case plan. See State, Dep't of Health & Rehabilitative Servs. v. M.H. (In the Interest of F.A.C.), 625 So.2d 909 (Fla. 2d DCA 1993); Howard v. Department of Health & Human Servs. (In re L.H.), 647 So.2d 311 (Fla. 5th DCA 1994). This remains true under the current statutory scheme.
[8] The Department argued that J.R. and V.R. lacked standing to appeal the order denying placement of the child with them after the termination because they were merely "participants." See § 39.01(37), (38), Fla. Stat. (1999); Fla. R. Juv. P. 8.210(b). See also § 39.473, Fla. Stat. (1999). A review of the record, however, reveals the trial court considered a motion to intervene filed by the couple, and then permitted them to present evidence and act, in all respects, as a full party in interest in the hearing below. Under the unusual facts of this case, the couple had standing to appeal this order.
[9] In fact, when Z.J.S. was first born, the Department hesitated to intervene when the parents were endeavoring to place the child with some friends and appoint them as the child's guardians.