903 So.2d 1034 (2005)
In the Interest of D.A.D. II and R.E.D., minor children.
D.A.D., Appellant,
v.
Department of Children and Family Services, Appellee.
No. 2D04-4623.
District Court of Appeal of Florida, Second District.
June 17, 2005.
*1036 Norman A. Palumbo, Jr., Tampa, for Appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, and Tanya E. DiFilippo, Assistant Attorney General, Tampa, for Appellee.
WALLACE, Judge.
D.A.D. (the Father) appeals the order terminating his parental rights to his children, D.A.D. II, a four-year-old boy, and R.E.D., a girl who turned three years old just before the order was entered. Although we disagree with the trial court's conclusions in some respects, we commend the trial court's thorough consideration of this troubling case and affirm the order terminating parental rights.

SECTION 39.806(1)(f)
Among the grounds for termination of parental rights alleged in the Department of Children and Family Services' petition was section 39.806(1)(f), Florida Statutes (2003), which authorizes termination of parental rights when "the parent or parents engaged in egregious conduct or had the opportunity and capability to prevent and knowingly failed to prevent egregious conduct that threatens the life, safety, or physical, mental, or emotional health of the child or the child's sibling." In a nine-day adjudicatory hearing, the Department presented testimony by the children's mother (the Mother), who testified in detail about her and her children's long, harrowing relationship with the Father. Neighbors of the family testified, as did the Department's child protective investigator.
The Department also presented evidence that the Father strangled a man to death in the family home while the Mother and the children were visiting relatives in another state. At the time of the adjudicatory hearing, the Father's murder trial had not yet commenced. Those testifying about the killing included the lead detective in the investigation, the medical examiner, the victim's mother, and the principle inculpatory witness, to whom the Father had confided details about the crime. This witness also testified about a separate incident in which the Father had shot his brother-in-law in an unsuccessful murder-for-hire plot. The police questioned the Father but did not charge him in connection with this separate incident. At the adjudicatory hearing, the Father testified on his own behalf regarding his version of events on the night of the killing as well as his conduct toward his family.
The trial court found that the Father committed egregious conduct under section 39.806(1)(f) in two circumstances. First, the court ruled that the Father's act of murder was "a legally sufficient basis to find the [F]ather unfit to parent these small children." Second, the Father's participation in the murder-for-hire plot to kill his brother-in-law, "coupled with the [F]ather's chronic drug abuse, alcoholism, lengthy criminal history, chronic abuse, and domestic violence, also constitutes `egregious conduct' and is, apart from the murder of [the victim], sufficient evidence of [the Father's] unfitness to parent."
To terminate parental rights on the ground of egregious conduct, "there must be a nexus between the conduct and the abuse, neglect, or specific harm to the *1037 child." C.B. v. Dep't of Children & Families, 874 So.2d 1246, 1254 (Fla. 4th DCA 2004); see K.R. v. Dep't of Children & Family Servs. (In re C.V.T., Jr.), 843 So.2d 366, 368 (Fla. 2d DCA 2003) (holding that the parent's past drug use did not support a finding of egregious conduct "without connecting the drug use to any abuse, neglect, or specific harm to the child"); P.S. v. Dep't of Children & Family Servs., 863 So.2d 392, 393 (Fla. 3d DCA 2003) (holding that the parent's arrest on drug charges while the children were present did not support a finding of egregious conduct because "[w]ithout connecting the arrest to any abuse, neglect or specific harm to the child that was present at the arrest or to her other children, this conduct alone cannot be the basis for a termination of parental rights").
In support of its finding of egregious conduct, the trial court relied on M.S. v. D.C., Jr., 763 So.2d 1051 (Fla. 4th DCA 1999), in which the father murdered his girlfriend in the family home while the children were in the house. The victim had become a "mother figure" to the children following the father's divorce from the natural mother. Id. at 1052. The M.S. court held: "Notwithstanding that the children may not have seen the shooting, the murder of their mother figure in their home and while they were present in the house certainly qualifies as egregious conduct that endangered the life, health, or safety of the children." Id. at 1053. The M.S. court demonstrated the nexus between the father's egregious conduct and the specific harm to the children by explaining in detail how the children suffered posttraumatic stress syndrome, anxiety disorders, behavioral problems, fear, flashbacks, and nightmares all linked to the events on the night of the murder. Id. at 1052-53.
In this case, the trial court did not find that the Father's murderous act was connected to specific harm to the children. Although the killing occurred in the family home, the children were in another state with the Mother at the time. The trial court made no finding that the children were even aware of the incident. Similarly, the court did not find that the Father's participation in the plot to kill his brother-in-law was connected to specific harm upon the children. Instead, the trial court made a finding of generalized harm: "Clearly, the [F]ather's extreme violence and callous disregard for the lives of others poses a significant danger to the life, safety, [and] mental and emotional health of these small children." Even though the Father's homicidal conduct was deplorable and outrageous, the trial court's generalized finding of harm was not enough to establish a sufficient nexus between the conduct and the specific harm to the children to support a finding of egregious conduct within the meaning of section 39.806(1)(f).[1]
Nevertheless, the record contains clear and convincing evidence that the Father's other conduct justified termination under section 39.806(1)(f). "Egregious conduct" means "abuse, abandonment, neglect, or any other conduct of the parent or parents that is deplorable, flagrant, or outrageous by a normal standard of conduct." § 39.806(1)(f)(2).[2] Because it would unduly lengthen this opinion to recount the *1038 findings of the trial court's thirty-page order, the following facts are merely representative of the totality of the Father's conduct.
The Father was an alcoholic and cocaine-abuser with an extensive criminal record who was frequently jailed after the birth of his son. He seldom worked and never contributed money for the household expenses. Rather, he spent whatever money he had on drugs, and failing that, he harassed the Mother for drug money. If she refused, he would threaten the Mother, play loud music, and keep the lights on all night to prevent her from sleeping so that she would be unable to work the next day. Using a cane, he would strike the bed where the Mother had gathered the children to protect them. The Father often badgered the Mother for drug money, and the resulting financial strain eventually caused the family's financial ruin and the loss of the family home to foreclosure.
The Mother was a registered nurse who was also an insulin-dependent diabetic. The Father often stole her insulin needles to inject cocaine into his veins. He also injected the Mother with cocaine while the children were in the home.[3] He endangered the Mother's life by involving her in a drug deal during which a fight erupted and the Father was shot in the hip.
In addition to frequent stints in jail, the Father was frequently absent from the family home while on cocaine binges. While the Mother was pregnant with their second child, the Father lived for six months in the Central Park area of Tampa, using drugs. Previously, the Father had participated in an inpatient alcohol and drug treatment program in 1992. This program was ineffective becausein the Father's own wordshe "fake[d] it to make it." While he was incarcerated in 1998, the Father completed an intensive alcohol and drug treatment program, but this program did not deter his alcohol and drug-fueled lifestyle after his release.
The Father's jealous and controlling behavior toward the Mother began at the inception of their relationship and continued after the birth of the children. The Father called the Mother vulgar names in the presence of the children, and when the children also called the Mother these names, he encouraged them. The Father also committed many acts of domestic violence while the children were present. On one occasion, the Father broke down the bathroom door while the Mother was bathing, injuring the Mother with splintered wood. When she attempted to call the police, the Father stole her insulin pump and threatened to break it. On another occasion, the Father was drunk and abusive, and the Mother wished to leave. The Father denied her the car keys and phone, holding her against her will. During this incident, the Father threatened the Mother and the children. At other times, the Father choked the Mother and threatened to kill her.
By consistently putting his need for cocaine and alcohol above the basic needs of his children, by frequently being absent from the family home due to crime and drug use, and by needlessly endangering the life of the Mother who was the children's only provider, the Father abandoned[4] and neglected[5] the children. In *1039 addition, the Father's acts of domestic violenceboth directed at the children and at the Mother in the presence of the childrenwas abuse of the children. See § 39.01(2);[6]see also § 39.01(30)(a), (i);[7]D.D. v. Dep't of Children & Families, 773 So.2d 615, 618 n. 2 (Fla. 5th DCA 2000) ("The detrimental effect of domestic violence on children who witness such violence is well documented.").
As the trial court found, the domestic violence in the home "seriously impacted the physical, mental[,] and emotional health and well being" of the children. The behavior of the son, D.A.D. II, was loud, disruptive, and aggressive, with most of the aggression directed toward the Mother but at times also directed toward his sister. On several occasions, D.A.D. II was seen pushing his little sister down for no apparent reason. He also hit his sister with a closed fist. D.A.D. II was hyperactive and aggressive, continually demanding the Mother's attention, hitting her, and deliberately running into her.
Arguably, any one act by the Father considered in isolation may not rise to the level of egregious conduct. However, taken as a whole, the Father's conduct comprised an unrelenting pattern of abuse, abandonment, and neglect. For this reason, the Father's conduct was "deplorable, flagrant, or outrageous by a normal standard of conduct" so as to be egregious conduct. See § 39.806(1)(f)(2); M.C. v. Dep't Children & Family Servs., 814 So.2d 449, 452 (Fla. 4th DCA 2001) (finding that "a pattern of physical abuse and ongoing neglect" of the child constituted egregious conduct under section 39.806(1)(f)).

SECTION 39.806(1)(g)
As a ground for terminating parental rights, the Department also alleged section 39.806(1)(g), which authorizes termination when the parent has "subjected the child to aggravated child abuse as defined in s. 827.03, sexual battery or sexual abuse as defined in s. 39.01, or chronic abuse." The trial court found that the Father committed chronic abuse under section 39.806(1)(g).
As noted above, the Father's egregious conduct was comprised of acts of abuse, abandonment, and neglect of the children. At the same time, the concepts of abandonment and neglect are subsumed within the meaning of "abuse" through the definition of "harm." See § 39.01(2), (30)(e), (f). Without question, the totality of the Father's conduct was "abuse."
Section 39.806(1)(g) does not require that the abuse be "egregious"; rather, it must be "chronic." Undefined in chapter 39, "chronic" ordinarily means "marked by long duration or frequent occurrence." Merriam-Webster's Collegiate Dictionary *1040 320 (Deluxe ed.1998). "Chronic" also means "always present or encountered" and "being such habitually." Id.
As noted above, the Father's abuse of the children was unrelenting. It began in 2000 shortly after the birth of D.A.D. II in October 1999 and continued through the time of the adjudicatory hearing in April 2004, interrupted only by the Father's incarcerations, which only contributed to his abandonment of the children. These facts support the trial court's finding that the abuse was "chronic" under section 39.806(1)(g).

SECTION 39.810
The Father contends that termination was not in the children's manifest best interests because he cared for them while the mother worked, never abused them, and provided for them when financially able. We find no basis to disturb the trial court's factual findings to the contrary or its other findings under section 39.810(1)(11).

SECTION 39.811(6)
This case was a one-parent termination case implicating section 39.811(6). Section 39.811(6) does not provide grounds for termination of parental rights. Rather, even if grounds for termination are proved and termination is in the child's manifest best interests, section 39.811(6) limits the court's power to dispose of the case by termination when one parent's rights are to be severed without severing the rights of the other parent. Section 39.811(6)(e) permits termination only when the parent meets the criteria specified in section 39.806(1)(d) and (f)-(i).
The trial court made no ruling with regard to section 39.811(6)(e). However, the trial court found that the Department proved grounds for termination under section 39.806(1)(f) and (g), which fall squarely within the scope of section 39.811(6)(e). Therefore, the trial court's statutory power to terminate was evident on the face of the order; the trial court was not required to make a specific finding under section 39.811(6)(e).

CONSTITUTIONAL REQUIREMENT
Because termination of parental rights implicates a fundamental liberty interest, termination must be the least restrictive means of protecting the children from serious harm. Padgett v. Dep't of Health & Rehabilitative Servs., 577 So.2d 565, 571 (Fla.1991). The Father complains that because the Department never offered him a case plan with a goal of reunification, a less restrictive alternative to termination remains to be tried.
We disagree. When the Department pursues termination of parental rights, it is not required to offer the parent a case plan with a goal of reunification. § 39.802(5). When any ground for termination is proved under section 39.806(1)(e)(i), reasonable efforts to preserve and reunify families are not required. § 39.806(2). The Father's egregious conduct and chronic abuse of the children, fueled by drug and alcohol abuse that has been resistant to treatment, demonstrates that there is no less restrictive alternative to termination. See M.C., 814 So.2d at 452 (holding that termination was the least restrictive alternative because "where egregious conduct occurs, the child's paramount safety and well-being prevails, and parental rights can be expeditiously terminated in the child's best interests"); see also Padgett, 577 So.2d at 570 (holding that while the parent's interest in maintaining parental ties is essential, the child's entitlement to an environment free of physical and emotional violence at the hands of his or her most trusted caretaker is more so).

CONCLUSION
Because we affirm for the reasons expressed above, we need not address other *1041 aspects of the order terminating parental rights.
Affirmed.
NORTHCUTT and KELLY, JJ., Concur.
NOTES
[1] As a matter of policy, should a parent who commits murder have his or her parental rights terminated? Yes, according to section 39.806(1)(d)(2), which provides that the parent's conviction of first-degree or second-degree murder is a ground for termination. However, section 39.806(1)(d)(2) requires a conviction. Section 39.806(1)(f) should not be used to excuse the conviction requirement of section 39.806(1)(d)(2) absent a sufficient nexus between the conduct and the specific harm to the children.
[2] Section 39.806(1)(f)(2) continues: "Egregious conduct may include an act or omission that occurred only once but was of such intensity, magnitude, or severity as to endanger the life of the child."
[3] At the time of the adjudicatory hearing, the Mother was working on a case plan with the goal of reunification.
[4] "`Abandoned' means a situation in which the parent ... while being able, makes no provision for the child's support and makes no effort to communicate with the child, which situation is sufficient to evince a willful rejection of parental obligations." § 39.01(1). The trial court also found that the Father's alleged efforts to care for his children were only "marginal" efforts that "[did] not evince a settled purpose to assume all parental duties." See id.
[5] "`Neglect' occurs when a child is deprived of, or is allowed to be deprived of, necessary food, clothing, shelter, or medical treatment or a child is permitted to live in an environment when such deprivation or environment causes the child's physical, mental, or emotional health to be significantly impaired or to be in danger of being significantly impaired." § 39.01(45).
[6] "`Abuse' means any willful act or threatened act that results in any physical, mental, or sexual injury or harm that causes or is likely to cause the child's physical, mental, or emotional health to be significantly impaired. Abuse of a child includes acts or omissions." § 39.01(2) (emphasis added).
[7] "Harm" occurs when the parent "[i]nflicts or allows to be inflicted upon the child physical, mental, or emotional injury," including engaging "in violent behavior that demonstrates a wanton disregard for the presence of a child and could reasonably result in serious injury to the child." § 39.01(30)(a), (i).